Arthur A. KELCEY, Plaintiff-Appellant,

v.

TANKERS COMPANY Incorporated, Defendant-Appellee-Cross-Appellant.

No. 77, Docket 23140.

United States Court of Appeals
Second Circuit.

Argued Oct. 7, 1954.

Decided Nov. 22, 1954.

L. Hand, Circuit Judge, dissented in part.

542

Henry Fogler, New York City, for appellant.

Nelson, Healy, Baillie & Burke, New York City (Allan A. Baillie and Richard T. O'Connell, New York City, of counsel), for appellee.

Before CLARK, Chief Judge, and L. HAND and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. Plaintiff filed a complaint, on February 5, 1951, alleging defendant's liability for an attack on plaintiff by a fellow seaman, which occurred in January, 1949, on defendant's vessel, Mission San Francisco. At the opening of the trial, on December 22, 1953, the trial judge, over defendant's objection, allowed an amendment of the complaint which alleged that the attack occurred on de-

fendant's vessel, U.S.N.T. Tomahawk on April 21, 1948.[1] Defendant argues that the judge erred, because the amendment asserted a new cause of action which, on December 22, 1953, was barred by the 3-year statute of limitations contained in the Jones Act. We do not agree. Both vessels were operated under contracts with the United States. The true facts as to the time and place of the assault were known to, or could reasonably have been ascertained by, the defendant, whereas the judge found that plaintiff had suffered from recurrent amnesia, which made it difficult for him to remember the true facts, and that finding is amply supported by the evidence. Especially as the amendment did defendant no actual harm, we think the judge ruled correctly, in the light of Rule 15(c), 28 U.S.C.A.[2] Tiller v. Atlantic Coast Line R. Co., 323 U.S. 574, 580–588, 65 S.Ct. 421, 89 L.Ed. 465; Woods v. Winters, 5 Cir., 171 F.2d 759; cf. Cummings v. Greif Bros. Cooperage Co., 8 Cir., 202 F. 2d 824.

2. The judge dismissed plaintiff's complaint so far as it covered a claim for maintenance and cure, or an aggravation of the injuries resulting from the assault due to defendant's alleged failure to provide medical care and attention. The facts as found by the judge—which are amply supported by the evidence and not "clearly erroneous"—showed (a) no failure to provide cure and (b) nothing to establish a causal relation in fact between the effects of the assault and the ailments from which plaintiff suffered in 1949 and subsequent years.[3]

■ 3. The judge awarded plaintiff $1,500 as damages for the relatively minor injuries to plaintiff immediately resulting from the assault on him by a fellow seaman. We think the facts, as found by the judge,[4] justified his con-

---

[1.] In his opinion, the judge said: "As a result of depositions taken after this action was commenced, it developed that there was no assault committed on plaintiff on the tanker 'Mission San Francisco' on January 2, 1949, but that plaintiff became ill and had a seizure on that vessel on January 15, 1949, while the vessel was at sea, in the Far East. * * * At the trial of this action on December 22, 1953, plaintiff moved to amend the complaint to allege that he sustained injuries by reason of an attack made upon him by a fellow member of the crew (Scott) on April 21, 1948, on the USNT 'Tomahawk,' and that on January 15, 1949, his injuries were aggravated on the USNT 'Mission San Francisco' by defendant's failure to provide medical care and attention. Plaintiff's attorney claimed that plaintiff had suffered a lapse of memory as a result of the injuries he received in the assault (alleged brain damage), and that that was the reason plaintiff thought the assault occurred on the USNT 'Mission San Francisco,' having forgotten about the USNT 'Tomahawk.' Only one assault was claimed. Both the vessels were operated by the defendant. The log of the 'Tomahawk' contained a record of the assault on April 21, 1948. The Captain of the 'Tomahawk' (Capt. Fertig) had testified by deposition on February 11, 1952, that the assault took place on the 'Tomahawk.' It appears that he was also the Captain of the 'Mission San Francisco' on January 15, 1949, and that plaintiff Kelcey was the steward on both vessels. Scott, the Second Cook, who committed the assault, was on the 'Tomahawk,' but was not on the 'Mission San Francisco'; in fact Scott died in December 1948, before plaintiff had the seizure on the 'Mission San Francisco' on January 15, 1949. I granted the motion to amend the complaint because it appeared that only one assault was involved and that someone had made a mistake as to the name of the vessel and the date of the assault."

[2.] That Rule reads: "Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

[3.] In his opinion, the judge said: "I am satisfied that Kelcey's claimed injuries were grossly exaggerated and that the ailments from which he suffered in 1949 and subsequent years are due to certain old physical conditions, some of them going back as far as 1936. * * *"

[4.] The judge made the following findings relative to this issue:
"6. On April 21, 1948, while plaintiff was engaged in the performance of

clusion that, for such damages, defendant was liable. Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515; Jones v. Lykes Bros. Steamship Co., Inc., 2 Cir., 204 F.2d 815.

 4. We do not agree with plaintiff that this award was inadequate. He had the burden of proof; McAllister v. United States, 2 Cir., 207 F.2d 952, reversed on other grounds, 1954, 75 S.Ct. 6. The judge's findings in this respect as in others, obviously are not "clearly erroneous." Indeed, as to this matter and all others, the judge most painstakingly explored every item of the evidence.

5. On October 11, 1949, plaintiff executed a release, on a printed form presented by defendant, which stated that, in consideration of a payment of $700 by defendant to plaintiff, he released the United States and Tankers Co., Inc., and "their several vessels and in particular the S. S. Mission San Francisco * * from every right and claim which I now have, or may hereafter have, on account of injuries and illnesses suffered by me as follows: ————————

[N.B. These lines were left blank], and in addition to that, I release them from each and every right which I now have or may hereafter have because of any matter or thing which happened before the signing of this paper, it being my intention by the signing of this paper to wipe the slate clean as between myself and the parties released, even as respects injuries, illnesses and claims not mentioned herein or not known to me. * * I know that, in signing this release, I am, among other things, settling in full for all injuries, illnesses and disabilities which I have now, and which I may have in the future, either because of the particular occurrence mentioned above or because of any other occurrence in the past, or because of both, even though I do not know that I have already, have now or may have in the future such injuries, illnesses or disabilities, and even

his duties as Chief Steward on the USNT 'Tomahawk' he became involved in an argument with the Second Cook, named Scott. The argument concerned Scott's work as a bakery cook. He was attacked by Scott and was punched several times in the face. Plaintiff did not provoke the attack.

"7. The Second Cook, Scott, was a strong young man, 25 years old. Plaintiff, Kelcey, was fifty-six and was no match for Scott physically.

"8. Scott had been convicted, while in the Navy in 1943, of an attack with a dangerous weapon and had served a sentence of a year for that assault.

"9. About two days prior to the attack of April 21, 1948, Scott had chased Kelcey out of the galley with a knife.

"10. Shortly after the attack of April 21, 1948, when the Captain sent the Chief Officer, Pedley, to bring Scott before him, Pedley was threatened by Scott with an axe and Scott did not drop the axe until Pedley threatened to shoot him.

"11. Scott was a belligerent man of a violent and vicious disposition and was a menace to the welfare of the crew.

"12. The USNT 'Tomahawk' was unseaworthy in respect to its crew in April 1948, in that it had Scott as its Second Cook.

"13. The Captain of the 'Tomahawk' was negligent in retaining Scott as a member of the crew, after he had been told two days before April 21, 1948, that Scott had chased Kelcey out of the galley with a knife.

"14. As a result of the attack by Scott on April 21, 1948, the plaintiff suffered injuries about his face, a cut over his left eye, a bloody nose, cuts about his mouth, and a damaged denture.

"15. Scott did not kick Kelcey in any part of his head or body on April 21, 1948, or at any time.

"16. The injuries which Kelcey suffered by reason of the attack by Scott were not serious or of a permanent nature. He did not suffer any brain injuries or hernia damage, or any permanent eye or ear injury as a result of the assault by Scott on April 21, 1948.

"17. The day following the aforesaid attack the plaintiff was able to and did resume his usual duties and occupation as a member of the crew of the USNT 'Tomahawk' to the end of the voyage. In fact he was working overtime within a few days thereafter, on April 23rd and 24th. * * *

"30. The defendant gave plaintiff proper and adequate medical care and treatment following the attack on the USNT 'Tomahawk' on April 21, 1948."

though they are not mentioned particularly in this release. * * * " [5] The judge, however, in one of his "Conclusions of Law," stated: "On October 11, 1949, prior to the institution of the within suit, plaintiff, Kelcey, signed a general release in which he relinquished any and all rights against defendant, Tankers Company Incorporated, for all injuries and/or illnesses which he may have received while in the employ of said defendant whether then known or unknown. The release referred specifically to the SS Mission San Francisco. The said release was executed by the plaintiff for the sum of $700.00, with the advice of counsel and with full knowledge of its contents; and his attorneys signed a certificate, as witnesses, that Kelcey understood that it was a release of everything. Plaintiff claims that at the time he executed the general release he did not remember the assault on the SS Tomahawk."

It is suggested that, in specifically referring in this release to the "Mission San Francisco," the parties made a mistake and that they actually intended to refer to the "Tomahawk." Were that so, we would be obliged to hold that the release barred plaintiff's claim. But, considering the following, it is by no means clear that there was such a mistake: (a) Plaintiff had served on the Mission San Francisco. (b) While serving on that vessel, on January 15, 1949, some nine months before he gave the release, plaintiff (as the judge expressly found) had suffered "a seizure, the outward appearance of which resembled a convulsion, as a result of which he fell and bruised the side of his face." (c) The judge found, "Both prior to and since the assault of April 21, 1948, the plaintiff has experienced lapses of memory of varying lengths." (d) In this very action the plaintiff contended that the failure to provide medical care after the seizure on the Mission San Francisco aggravated the injuries resulting from the earlier assault on board the Tomahawk. Considering his lapse of memory, it may well be that at the time he executed the release, he, and his lawyers then advising him, had in mind solely the happening on board the Mission San Francisco and thought he had a claim based solely thereon. (e) The release made no mention of any injury due to any assault whatever occurring on any of defendant's vessels,[6] and notably left blank the space—in the printed release form tendered by defendant—after the words "injuries and illnesses as follows."

■ That the release constituted a defense might be a necessary conclusion if plaintiff, on this issue, had the burden of proof. But the crucial factor here is that a release by a seaman to his employer differs markedly from a release by an ordinary worker to his employer.[7] The Supreme Court, in Garrett v. Moore-McCormack Co., Inc., 317 U.S. 239, 247, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239, has said that, because seamen are "wards of admiralty," their releases "are subject to careful scrutiny. 'One who claims that a seaman has signed away his rights to what in law is due him in law must be prepared to *take the burden of sustaining the release* as fairly made with and fully comprehended by the seaman.' Harmon v. United States, 5 Cir., 59 F.2d 372, 373. We hold, therefore, that the *burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing*

---

5. The release included the following statement in plaintiff's handwriting: "I know that doctors and other persons make mistakes, and I am taking the risk that what they may have told me is wrong. If that should be the case, it is my loss, and I cannot back out of the settlement."

6. In this respect, the release is unlike plaintiff's original complaint, filed in February 1951, which specifically alleged an assault but named the wrong vessel.

7. Callen v. Pennsylvania R. Co., 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242.

*the release are relevant to an appraisal of this understanding.*" (Emphasis added.) See also Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336. Here, as in other contexts, allocation of the burden of proof rests on policy considerations. The policy vis-à-vis a seaman's release has been emphatically declared by the Supreme Court.

■ Accordingly, on the facts here, defendant had the burden of showing that, when plaintiff executed the release in October 1949, he remembered—or, at least, the lawyers who at that time advised him, knew of—(a) some injury or some assault which had happened to plaintiff when he served on some vessel owned by defendant other than the Mission San Francisco or (b) some mishap to plaintiff while serving on the Tomahawk; otherwise defendant could not successfully maintain that plaintiff had such legal advice as the Supreme Court has held essential to sustain the release. Defendant did not discharge that burden. Doubtless, on that account, the experienced trial judge concluded to disregard the release.

The facts here are unlike those in Sitchon v. American Export Lines, 2 Cir., 113 F.2d 830, 831. There, with the advice of his lawyers, the seaman signed a release which covered "each and every right or claim which I now have, or may hereafter have, because of any matter or thing which happened before the signing of this paper", and which also said: "I know that in signing this release I am taking the risk that I may now or in the future have other injuries, illnesses or disabilities that I do not now know of, including not only those resulting from the particular occurrence mentioned above but also those resulting from all other occurrences, whether they are or are not mentioned in the release. I also know that I am taking the risk that the injuries I do know of may be or may turn out to be worse than they seem to me now." We held that this release barred his subsequent suit based on the fact that his injuries were far more extensive than he had thought when he gave the release. Distinguishing our earlier opinion in Bonici v. Standard Oil Co., 2 Cir., 103 F.2d 437, we said: "Bonici did not, like Sitchon, have the advantage of the independent advice of his own physician and lawyer, and only acted on the advice of one who would naturally have been partial to his employer. * * * Here the seaman and his attorney before making the settlement relied on two examinations by the Marine Hospital and the defendant made no separate examination. Each party entered into a settlement based on identical information and conducted in the fairest manner. * * * The release here contemplated a settlement of claims for all present and future damages arising out of the accident. The settlement does not bear the slightest taint of fraud and if there was a mistake as to the nature or extent of the injuries, and the judge in the court below seems to have thought there was none, the release accompanying the settlement fairly arrived at was a bar to the plaintiff's action. * * * *"

It is suggested that the foregoing ruling will prejudice seamen in the future by preventing settlement of their claims out of court. Answering a similar suggestion, the writer of this opinion said, when concurring in Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, 760, 769, "The Pennsylvania Railroad Company warns us that, if a release given by an employee, advised by his own lawyer, is disregarded in a case like this, in the absence of fraud on the part of the employer, then employers will never hereafter settle with their employees who, to their grave disadvantage, will always in the future be forced to sue even for minor personal injury claims. That is a glib prediction based upon no evidence and intended to frighten the court. Sometimes judges have been persuaded by such prophecies which later events have shown to have been unfounded. So, Choate, in Pollock v. Farmers' Loan & Trust Company, 1895, 157 U.S. 429, 532, 15 S.Ct. 673, 39 L.Ed. 759,

seemingly alarmed the majority of the Court by his forecast that a federal income tax would usher in a communist regime in this country. And it is well to recall Lord Abinger's dire prediction when in 1837 he enunciated the fellow-servant rule which the Employers Liability Act has wiped out: 'If the master be liable to the servant in this action, the principle of liability will be found to carry us to an alarming extent. * * * The inconvenience, not to say the absurdity of these consequences, afford a sufficient argument against the application of this principle to the present case. * * * In fact, to allow this action to prevail would be an encouragement to the servant to omit that diligence and caution which he is in duty bound to exercise on the behalf of his masters, to protect him against the misconduct of others who serve him, and which diligence and caution, while they protect the master, are a much better security against any injury the servant may sustain by the negligence of others engaged under the same master, than any recourse against his master for damages could possibly afford.' Certainly, that prophecy went astray. In New York, the rule as to releases is precisely that to which the Pennsylvania Railroad here objects; yet I venture to guess that thousands of settlements yearly are made in New York by employers who take the risk that, on a proper showing, the releases will be judicially disregarded. * * * We know, from the cases, that shipowners have often made settlements for relatively small sums, procuring releases from seamen who were not advised by their own lawyers, despite the decisions that such settlements, on a proper showing, will be ignored by the courts. That goes to show that employers are willing to make such settlements in the face of the risk that they may be set aside."

■■ The release in the instant case ran to the defendant as owner of its "several vessels," and in particular the Mission San Francisco. It is argued that the words "several vessels," and the other general terms, discharged all claims for injuries on the Tomahawk. But, even in the case of one not a seaman, the usual rule is that general words in a release are to be disregarded when followed or preceded by words relating to specific claims. See, e. g., Haskell v. Miller, 221 App.Div. 48, 222 N.Y.S. 619, affirmed 246 N.Y. 618, 159 N.E. 675; In re Quick's Will, 147 Misc. 28, 263 N.Y.S. 146, 152 and cases cited therein; Lancaster Trust Co. v. Engle, 337 Pa. 176, 10 A.2d 381; Union Pacific Ry. Co. v. Artist, 8 Cir., 60 F. 365, 367, 23 L.R.A. 581, cited with approval in Texas & Pacific Ry. Co. v. Dashiell, 198 U.S. 521, 25 S.Ct. 737, 49 L.Ed. 1150; United States Express Co. v. Ball, 36 App.D.C. 269; Gelman v. Wendrick, 321 Ill.App. 639, 53 N.E.2d 479. True, in Vines v. General Outdoor Advertising Co., 2 Cir., 171 F.2d 487, 492, where we applied the usual rule, we said that it is not inexorable. But that rule applies in the case of a seaman, and especially on the facts here.

Affirmed.

L. HAND, Circuit Judge (dissenting in part).

I agree with all my brothers say except as to the release. Two questions about it arise: (1) As a matter of interpretation did it cover the assault on the Tomahawk? (2) If so, should the plaintiff be allowed to repudiate it? The doctrine has indeed been pressed to great lengths that general words of release will be disregarded when they accompany the release of a specified claim. Yet I do not understand that it has ever been held that an obligee cannot make a general release covering every claim he may have, known or unknown, if it is coupled with the release of a particular claim. I cannot imagine any rational ground for so holding; and the courts have said over and over again that the question is always one of "intent," however equivocally that may be used. It would be impossible, I submit, more explicitly to state a purpose "to wipe the slate clean,"

548

—as the parties themselves put it—than the language of this release has stated a purpose to do just that. Thus, I should have no doubt about the proper way to construe this release, even if it had appeared that the plaintiff supposed that he had had a claim arising out of his fall on the Mission San Francisco. However, although, as my brothers suggest, he and his lawyers may have "had in mind solely the happening on board the 'Mission San Francisco' and thought he had a claim based solely thereon," there is no evidence to support such an assumption; and as matter of mere speculation it seems to me extremely unlikely. The judge made no such finding, but rested his judgment only upon the fact that the release mentioned the wrong ship: i. e. the claim in suit was not identified. I submit that, even though it be applied with the most rigid literalness, the necessary ground for the doctrine is absent until we can see that the parties had before them some specific claim other than that on which this action was brought.

As to the second question, once the verbal scope of the claim is fixed, I cannot see that any of the protection properly accorded to seamen was not granted; I am content to abide by the test laid down in Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239. Indeed I think that our own decision in Sitchon v. American Export Lines, 2 Cir., 113 F.2d 830, should control, though the facts were not absolutely on all fours. If what we are holding is the law, every seaman is free to get what he can get, keep it, and gamble on whether he can later persuade the judge or the jury that he forgot the existence of the only claim he ever in fact did have. No one can escape his own limitations and my difference with my brothers may come from an insensibility to the economic subjection of seamen, and from a failure to make enough allowance for their credulity; but, confined as I am, it seems to me that to allow this release to be repudiated is not only unwarranted in law, but unsanctioned in morals.