**In re GIBSON & CUSHMAN DREDGING CORP.,**
Debtor.

**GIBSON & CUSHMAN DREDGING CORP.,**

v.

Thomas **HEALEY**, Esq., and Healey & McCaffrey, Esqs., Bigham, Englar, Jones & Houston, Travelers Indemnity Co., Atlantic Gulf & Pacific Co., John McMullen Trust and Joseph DiIorio.

Bankruptcy No. 088–80147–511.
Adversary No. 088–0117–511.

United States Bankruptcy Court,
E.D. New York.

Sept. 28, 1998.

Richard J. Reisch, Carle Place, NY, by Richard J. Reisch, for Plaintiff.

Mahoney & Keane, New York City, by Edward A. Keane, for Defendants.

### DECISION AFTER TRIAL

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

***Proposed Findings of Fact & Conclusions of Law Pursuant to 28 U.S.C. § 157(c)(1) (Re: Claim of Legal Malpractice as Against Defendants Thomas Healey and Healey & McCaffrey)***

Gibson & Cushman Dredging Corp. (the "Debtor" or "G & C"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 26, 1988. On August 18, 1988, the Debtor commenced the instant adversary proceeding against, *inter alia,* its former attorneys, Healey & McCaffrey, Esqs. ("H & M"), and Thomas Healey, Esq. ("Healey" and collectively with H & M, the "Defendants").[1] G & C seeks damages

---

1. At the time of trial, some five and one-half years after the within complaint was filed, the only cause of action that remained was the second, which is asserted against Healey and H & M. All claims against the other defendants were previously resolved. The other named defen-

resulting from the alleged legal malpractice committed by H & M and Healey during a prior state-court proceeding. The Court conducted a three-day trial on the merits at which various witnesses appeared and exhibits were received into the evidentiary record.[2] Thereafter, the parties each filed a Post–Trial Memorandum of Law. The Court thereupon reserved decision.

As this is a non-core proceeding,[3] this decision constitutes the Court's proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1).[4]

### The Pleadings

The second, and sole remaining, cause of action in this adversary proceeding alleges that Defendants committed legal malpractice when they represented the Debtor in an action for personal injuries commenced by Joseph P. DiIorio ("DiIorio"), in the Supreme Court of the State of New York, New York County (the "State Court"). The malpractice stems from Defendants' failure to: (i) implead Atlantic Gulf & Pacific Co. ("AG & P") as a third-party defendant in the State Court action; (ii) raise the affirmative defense of release; (iii) conduct appropriate pre-trial discovery; (iv) properly and satisfactorily cross-examine DiIorio's expert witness; (v) adequately and properly prepare for the examinations of witnesses and to exercise sound judgment in the tactical preparation of the defense; and (vi) seek a judicial determination of AG & P's equitable share of damages. Compl't ¶¶ 49–54. Debtor seeks compensatory damages, in the amount of the judgment rendered against it, as well as consequential damages resulting from any malpractice.

In their Answer, the Defendants deny the substantive allegations, except that they admit that they did not implead AG & P. Answer ¶ 20.[5] Defendants also raise five affirmative defenses and allege two counterclaims against G & C. In their first three affirmative defenses, Defendants assert that: (i) this Court lacks subject matter jurisdiction; (ii) the complaint fails to state a claim against them; and (iii) G & C willfully misstated and concealed information relevant to the facts of the State Court proceeding and

---

2. During the trial, the Court heard the testimony of William Gahagan, Christopher Kirk, Norman H. Dachs and Terence Gargan. The Court received into evidence Debtor's Exhibits 1–3, 3A, 4–9, 11, and 13, and Defendants' Exhibits A–C.

The dants to this adversary proceeding include: Bigham, Englar, Jones & Houston ("BEJ & H") (Debtor's counsel which succeeded H & M); Travelers Indemnity Co. ("Travelers") (Debtor's insurance company who retained H & M); Atlantic Gulf & Pacific Co. ("AG & P") (the entity who employed the Debtor); the John McMullen Trust ("JMT") (AG & P's sole shareholder), and Joseph DiIorio ("DiIorio") (the seaman employed by AG & P, and the plaintiff in the state court action who was injured). By Order, dated October 15, 1993, summary judgment was granted in favor of BEJ & H and the complaint was thereby dismissed as against it. By Order dated January 9, 1989, the complaint was dismissed as against Travelers. By Order, dated March 25, 1991, summary judgment was granted in favor of JMT and the complaint was thereby dismissed as against it. AG & P was involuntarily dissolved by decree of the Kanawha County Circuit Court on August 14, 1981. While it could not be determined whether an order was entered dismissing the action as against DiIorio, the parties advised the Court in closing argument that "[a]ll other defendants, and all other causes of action have previously been dismissed by the Court." Tr. (Feb. 3) at 72.

3. Prior to trial, the Court, by Decision, dated March 14, 1989, of the Hon. Cecelia Goetz (ret.) rendered in connection with BEJ & H's motion to dismiss, determined that this proceeding was not a core proceeding. Absent consent of the parties, the Court may not enter final orders or judgments but must submit proposed findings of fact and conclusions of law to the district court for *de novo* review. *See* 28 U.S.C. § 157(c). Pursuant to Fed.R.Bankr.P. 9033, *the parties* have 10 days within which to file written objections to the proposed findings of fact and conclusions of law set forth herein.

4. 28 U.S.C. § 157(c)(1) states:

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district court after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected.

5. Unless specified to the contrary, all references herein to the "Answer" refer to H & M and Healey's Answer, dated September 23, 1988, to the adversary proceeding complaint.

that this adversary proceeding is without factual or legal basis.

Defendants' remaining two affirmative defenses are coupled with counterclaims. The first alleges that G & C had actual knowledge of misrepresentations and misstatements of material information, and that such conduct is in violation of the cooperation clause of the policy of insurance between G & C and Travelers Indemnity Co. ("Travelers"). Defendants seek judgment on their first counterclaim in the amount of $100,000, plus costs and attorneys fees. In their second counterclaim, Defendants seek punitive damages in the amount of $500,000.

### General Background

The adversary proceeding here stems from an action for personal injuries suffered by DiIorio while a seaman aboard the dredge Pittsburgh, which was within the navigable waters of the United States and located in Sunnypoint, North Carolina. After sustaining these injuries, DiIorio commenced suit in State Court against G & C.

### The DiIorio State–Court Litigation and Appeals

On September 12, 1972, G & C and AG & P entered into an agreement whereby G & C, as an alleged nominee of AG & P, would bid on a dredging contract (the "Sunnypoint job") with the United States Army Corps of Engineers ("USACE"). Pl. Exh. 3A. Under the terms of the agreement, AG & P would do 60% of the work and subcontract out the remaining 40% of the work. Id. G & C's sole obligation was to bid on the contract and, if successful, to "engage in such formalities as were required of the successful bidder." Compl't ¶ 14. AG & P, a large dredging company, could not directly bid on this contract due to a "small business set aside" which mandated that only small businesses could bid on the Sunnypoint job. Trial Tr. (Feb. 1) at 12. G & C was ultimately awarded the contract and thereafter became the primary contractor. Compl't ¶ 15 and Answer ¶ 3.

One of the formalities required of G & C was to submit an accident prevention plan to the USACE. Trial Tr. (Feb. 1) at 26. G & C's accident prevention plan named William Tabbot ("Tabbot") as G & C's authorized representative. Pl. Exh. 2 at E3–E7. It was shown at trial, however, that Tabbot was employed by AG & P, and not G & C. Trial Tr. (Feb. 1) at 18–19; 99.

During the course of the dredging, a main steam generator turbine on the Pittsburgh exploded, injuring DiIorio. At all times mentioned, AG & P owned and operated the Pittsburgh. Id. at 63.

DiIorio commenced an action against AG & P under the general maritime law of the United States, alleging, among other things, that the vessel was unseaworthy and that AG & P was negligent in providing safe conditions. Compl't, Exh. 3. This suit was ultimately settled with AG & P paying DiIorio $600,000 and DiIorio executing a release in favor of AG & P and certain other entities. Pl. Exh. 7. That release, dated November 22, 1975 (the "DiIorio Release"), provides, in pertinent part, that the following entities (in addition to AG & P) were released by DiIorio:

[T]he dredge Pittsburgh, its captain, officers, crewmembers, agents, owners, *charterers* and all vessels owned and operated by AG & P, Inc., their heirs, administrators, successors and assigns. . . .

*Id.,* (emphasis added).

On or about January 21, 1976, approximately 60 days after DiIorio released AG & P, he commenced an action against G & C in State Court under the General Maritime Laws of the United States and the theory of comparative negligence under the Maritime Doctrine of Shipowner's Warranty of Seaworthiness. Pl. Exh. 5. In his complaint, DiIorio describes G & C as a "charterer" or a "time charterer" in at least six paragraphs. *See id.* at ¶¶ 10, 11, 13, 14, 18 and 21. DiIorio was represented by the same attorney in both the G & C action and in the action against AG & P. Pl. Exh. 5 at 7; Compl't, Exh. 3 at 6.

Healey and H & M were engaged by Travelers to represent and defend G & C and they interposed an answer on behalf of G & C. Pl. Exh. 6. The answer did *not* contain an affirmative defense alleging that the action was barred by reason of DiIorio's re-

lease of AG & P and the other parties named therein. *Id.* Before trial, the issues of liability and damages were bifurcated by the trial court. On October 31, 1987, in the liability portion of the trial, the jury returned a verdict against G & C, finding that G & C was liable to DiIorio for such damages as he may have suffered as a result of the steam turbine explosion. Pl. Exh. 1 at A1376–A1384. Following the liability portion of the trial, but before the damages portion began, H & M was discharged by Travelers and the firm of Bigham, Englar, Jones & Houston ("BEJ & H") was retained. Compl't ¶ 35.

BEJ & H thereafter appeared on behalf of G & C in the damages portion of the trial. On December 29, 1987, the jury returned a verdict in favor of DiIorio against G & C in the sum of $6,578,698. The judgment was subsequently reduced by the trial court to the sum of $3,078,696 on January 13, 1988. The judgment was further reduced by the trial court by $600,000 as a result of the settlement between DiIorio and AG & P. After taking all these reductions into account, the judgment totaled $2,478,696 as against G & C. Compl't ¶ 37.

G & C ultimately appealed the judgment to the Supreme Court of the State of New York, Appellate Division, First Department (the "Appellate Division"). By written decision dated June 27, 1989,[6] the Appellate Division ordered a new trial unless DiIorio consented to reduce the award for future earnings to $750,000. In accordance with the Appellate Division's ruling, a modified judgment was entered against G & C in the amount of $1,728,696.

Thereafter, G & C (by its new counsel, BEJ & H) moved before the State Court to vacate the judgment on the grounds of newly discovered evidence and/or fraud based on the release between DiIorio and AG & P. After the State Court denied the motion, G & C appealed. By written decision dated May 29, 1990,[7] the Appellate Division affirmed the State Court's ruling, finding that "the release in question does *not* expressly or impliedly release defendant from liability for plaintiff's injuries" (emphasis added). However, on reargument, the Appellate Division modified its May 29, 1990 Order and withdrew the above-quoted sentenced as it was determined to be inconsistent with the New York Court of Appeals ruling in *Wells v. Shearson Lehman/American Express,* 72 N.Y.2d 11, 14, 530 N.Y.S.2d 517, 526, 526 N.E.2d 8 (1988).[8] The Appellate Division ultimately concluded that the reference to "charterers" in DiIorio's release included G & C, but that G & C waived this defense by failing to plead and prove it.[9]

### The Contentions of the Parties

The principal question before the Court is whether Healey, and thus H & M, committed malpractice by not including the affirmative defense of release in G & C's answer. Healey and H & M contend that they did not, arguing that (i) under federal maritime law, a "seaman's release," such as that given by DiIorio, is construed strictly and would not include any party not expressly delineated; and (ii) to have alleged the affirmative defense of release was not without risks in that, in the event the affirmative defense did not succeed as a matter of law, the jury could have concluded that G & C was a charterer and thereby exposed G & C to a potentially greater adverse jury verdict. For its part, the Debtor disagrees and urges that any competent practitioner of New York State law would have included the affirmative defense of release in G & C's answer as a matter of course and that it was legal malpractice not to do so.

### DISCUSSION

#### A. The Standard for Legal Malpractice

 It is well settled that an " 'action for legal malpractice requires proof of three

---

**6.** See *DiIorio v. Gibson & Cushman of New York, Inc.,* 151 A.D.2d 402, 542 N.Y.S.2d 625 (1st Dept.1989) ("*DiIorio I*").

**7.** See *DiIorio v. Gibson & Cushman of New York, Inc.,* 1990 WL 70221 (1st Dept.1990) ("*DiIorio II*").

**8.** To place it in perspective, the *Wells* decision in 1988 was thus rendered well *after* the pleadings were filed in 1976 and *after* both trials on the liability and damages were completed in 1987.

**9.** See *DiIorio v. Gibson & Cushman of New York, Inc.,* 161 A.D.2d 532, 566 N.Y.S.2d 1 (1st Dept. 1990) ("*DiIorio III*").

essential elements: (1) the negligence of the attorney; (2) that the negligence was the proximate cause of the loss sustained, and (3) proof of actual damages.' " *Prudential v. Dewey Ballantine*, 170 A.D.2d 108, 573 N.Y.S.2d 981, 985 (1st Dept.1991), *aff'd*, 80 N.Y.2d 377, 590 N.Y.S.2d 831, 605 N.E.2d 318 (1992), and cases cited therein. The governing standard is that "an attorney is liable in a malpractice action if it can be proved that his conduct fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession." *Bernstein v. Oppenheim & Co., P.C.*, 160 A.D.2d 428, 430, 554 N.Y.S.2d 487, 489 (1st Dept.1990). "However, an attorney is not held to the rule of infallibility and is not liable for an honest mistake of judgment, where the proper course is open to reasonable doubt." *Id.* Therefore, "selection of one among several reasonable courses of action does not constitute malpractice." *Rosner v. Paley*, 65 N.Y.2d 736, 492 N.Y.S.2d 13, 14, 481 N.E.2d 553 (1985).

■ Similarly, it has been said that "[i]n order to establish the elements of proximate cause and actual damages in a malpractice case, the plaintiff must show that but for the attorney's negligence, what would have been a favorable outcome was an unfavorable outcome. The test is 'whether a proper defense would have altered the result of the prior action.' " *Zarin v. Reid & Priest*, 184 A.D.2d 385, 585 N.Y.S.2d 379, 381 (1st Dept.1992)

(quoting *Carmel v. Lunney*, 70 N.Y.2d 169, 173, 518 N.Y.S.2d 605, 511 N.E.2d 1126 (1987)). Allegations that do no more than "second guess" the attorney's strategy are not sufficient. It is similarly not enough if the damages claimed are too speculative and incapable of being proven with any reasonable certainty. *See Zarin, supra*, 585 N.Y.S.2d at 382.

## B. The Alleged Malpractice

■ When considering whether the conduct of H & M and Healey fell below the ordinary and reasonable standard possessed by members of the legal profession, the Court must look at the law and facts existent at the time that they represented G & C. Equally important is what course of action Healey followed, as opposed to that of subsequent attorneys.[10]

The record clearly shows that, from the outset, Healey and H & M litigated the case based upon federal maritime law and that, for the most part, the State Court and DiIorio's counsel agreed.[11] Under the applicable standards, the question that arises is whether it was reasonable to approach and treat the DiIorio lawsuit as maritime in nature, in which case federal maritime law would control, or whether it was simply a land-based negligence action, in which event New York State law would control. The mere fact that the Appellate Division ultimately ruled that the DiIorio lawsuit was not maritime in na-

---

**10.** Because Healey and H & M were discharged immediately after the liability trial, they obviously had no input into, or decision-making authority regarding, the damages portion of the trial or any subsequent motions or appeals.

**11.** For example, at the liability trial in which Healey was counsel, during conversations regarding the jury charge, on the record but outside the presence of the jury, the following remarks were made (emphasis added):
- By the Trial Court: "I think under the Jones Act you are right, but I think under the *general maritime negligence*, I am not sure you are right . . . . (Pl. Exh. 1 at A1296);
- By Healey: "Just what is encompassed as to whether you are going to charge *maritime tort* (Pl. Exh. 1 at A1299);
- By the Trial Court: "I looked at the cases again, and I think that is appropriate standard in a *maritime negligence case*." (Pl. Exh. 1 at A1372)

However, at the damages trial, during a conversation on the record but outside the presence of the jury, G & C's new attorney, and not Healey, asserted that this was not a maritime case; DiIorio's attorney (Kenneth Heller, Esq.) disagreed and argued that it was. After Healey no longer represented G & C, the State Court concluded that the case was "not a maritime case." Pl. Exh. 1 at 12–13.

The Debtor also relies upon three letters (Pl. Exhs. 8, 9 and 11) which purport to show that Healey and his firm were aware that the General Obligations Law of the State of New York controlled, and not federal maritime law. Because of the context within which these letters were written and the fact that they were written by an associate of H & M (Ralph P. Cosentino, Esq.), however, the Court does not believe that these letters reflected the litigation strategy of the firm.

ture (after first concluding that it was) is not determinative of the issue. *See DiIorio III* and *DiIorio IV.*

In order to determine if maritime law controls, two criteria must be present: (i) the alleged tortious act must occur on navigable waters (the "locality test"); and (ii) there must be a relationship between the wrong and traditional maritime activity (the "nexus test"). *See Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). This two-fold test is satisfied here. First, in the underlying action, the dredge Pittsburgh was in waters off the North Carolina coast and was thus clearly in navigable waters. Second, "the operation of a dredge has a significant relationship to traditional maritime activity. It is only in maritime activity that a dredge is used." *Ramos v. Universal Dredging Corp.,* 653 F.2d 1353, 1358 (9th Cir.1981).

Other factors also point to characterizing the DiIorio lawsuit as one in maritime law. A review of the complaint in the State Court action clearly shows that DiIorio alleged that the "suit [was] brought under the General Maritime Law of the United States...." Pl. Exh. 5, ¶ 12. Throughout the liability and damages portion of the State Court trial, DiIorio's counsel (Kenneth Heller, Esq.) unequivocally stated that "[t]his [the State Court case] is absolutely a maritime case." Pl.Exh. 1 at 13. Moreover, in its first ruling, in a published opinion dated November 20, 1990, the Appellate Division agreed and expressly found that the DiIorio lawsuit was a "maritime personal injury action...." *DiIorio IV v. Gibson & Cushman of New York, Inc.,* 167 A.D.2d 267, 561 N.Y.S.2d 767, 768 (1990). Accordingly, it was reasonable for Healey and H & M to have believed that the underlying action was maritime in nature and to have consequently developed a litigation strategy based upon this belief.

When approaching the DiIorio lawsuit as one arising under federal maritime law, the significance of construing releases becomes apparent. Under maritime law, there is a so-called "seaman's release." "[T]he crucial factor here is that a release by a seaman to his employer differs markedly from a release by an ordinary worker to his employer."

*Kelcey v. Tankers Co.,* 217 F.2d 541, 545 (2d Cir.1954) (*citing Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942)). This is so because "seamen are 'wards of admiralty' [and] their releases 'are subject to careful scrutiny.'" *Id.* (*quoting Garrett, supra,* 317 U.S. at 247, 63 S.Ct. at 252). As stated by the Second Circuit in *Kelcey,* the burden

> is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding. (emphasis omitted)

*Id.* at 545–46 (*quoting Garrett, supra,* 317 U.S. at 248, 63 S.Ct. at 252); *see also Cates v. United States,* 451 F.2d 411, 414 n. 10 (5th Cir.1971) ("The burden is on the party setting up the seaman's release to show that it was given by the seaman with an informed understanding of his rights and a full appreciation of the consequences of his release").

Even if it is clear that maritime law applies, it does not necessarily follow that all workers are deemed to be "seamen." Rather, a "[s]eaman's status extends to all those aboard a ship 'doing a seaman's work and incurring a seaman's hazards.'" *Griffin v. LeCompte,* 471 So.2d 1382, 1385 (La.1985) (*quoting Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 630 n. 9, 79 S.Ct. 406, 410 n. 9, 3 L.Ed.2d 550 (1959)). "Under General Maritime Law, a seaman is anyone working aboard a vessel in navigable waters: whose labor contributes to the purpose of the vessel; is exposed to the usual maritime risks; and/or does tasks traditionally performed by members of a ship's crew." *Id.* (*citing International Stevedoring Co. v. Haverty,* 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926); *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946)); *see also Barrios v. Louisiana Construction Materials Co.,* 465 F.2d 1157, 1161 (5th Cir.1972). Oilers on dredges have consistently been found to be seamen. *See Reyes v. Vantage S.S. Co., Inc.,* 672 F.2d 556,

557 (5th Cir.1982) (finding that an oiler was a seaman); *Barrios, supra,* 465 F.2d at 1163 (finding that there was ample evidence to support the conclusion that an oiler was a seaman). Therefore, since DiIorio was, in fact, an oiler, it appears reasonable for Healey to have considered him a seaman under the federal maritime laws.

Since DiIorio could reasonably be considered a seaman, it follows that it is reasonable for Healey to have concluded that DiIorio was entitled to the benefits inherent in a "seaman's release." Healey claims that he knew this and took this into account when considering whether to plead the DiIorio Release as an affirmative defense. By its express terms, the release does not specifically release G & C. Rather, DiIorio expressly released only AG & P and "the dredge Pittsburgh, its captain, officers, crewmembers, agents, owners, charterers and all vessels owned and operated by AG & P, Inc., their heirs, administrators, successors and assigns . . . ." Pl.Exh. 7.

The question then is whether it was reasonable or not for Healey and H & M to take the position that G & C was not a charterer and that, as a result, G & C was not included within the purview of the DiIorio Release. The Debtor urges, of course, that it was not and that Healey was negligent in failing to assert the release as an affirmative defense. In support of its argument, the Debtor points to the DiIorio complaint in which he alleges that G & C is a "charterer" and to the decision of the Appellate Division in *DiIorio III* in which the court held that the release included G & C. Particularly in hindsight, each of these factors is persuasive.

On the other hand, other considerations militate against the Debtor's position and in favor of Healey's contention that it was reasonable for him to have concluded that the DiIorio Release did not include G & C. First, the DiIorio lawsuit was commenced against G & C only 60 days after the release was given. DiIorio's counsel had participated in both the drafting of the release and the complaint. There is no basis to believe that DiIorio's counsel was not aware of the release at the time that the complaint was filed against G & C. Second, as the Debtor conceded at the trial before this Court in the pending adversary proceeding, it is not, in fact, a charterer. Trial Tr. (Feb. 2) at 42. With the exception of the complaint's singular reference to "charterer," the entire record both here, as well as in the State Court litigation, is devoid of any evidence demonstrating that DiIorio intended to release G & C. Third, when the Appellate Division initially considered the issue, the court stated, in dicta, that the DiIorio Release did not expressly or impliedly release G & C. *See DiIorio II,* 1990 WL 70221. Only upon reargument and relying on a non-maritime 1988 case did the Appellate Division reverse, holding that DiIorio intended to release G & C. *See DiIorio III.*

■ "It is well-settled that an attorney may take chances, and '(i)f in such cases a lawyer errs on a question not elementary or conclusively settled by authority, that error is one of judgment for which he is not liable.'" *Parksville Mobile Modular, Inc. v. Fabricant,* 73 A.D.2d 595, 600, 422 N.Y.S.2d 710, 717 (2d Dept.1979) (*quoting Byrnes v. Palmer,* 18 A.D. 1, 4, 45 N.Y.S. 479, 482, *aff'd,* 160 N.Y. 699, 55 N.E. 1093 (1899)). In view of the disparate determinations by the Appellate Division, the state of the law at the time, and the conceded fact that G & C is not a charterer (notwithstanding the complaint's allegation), Healey's actions may be considered one of judgment and thus not actionable. For these reasons, the Court concludes that it was reasonable for Healey to have assumed that the DiIorio Release, especially when strictly construed under maritime law, did not release G & C.

Hindsight often suggests that the proper course was the one not taken. In view of the ultimate holding by the Appellate Division, the obvious response is that Healey should have been overly cautious and erred on the side of over-inclusion by asserting the affirmative defense of release in the classic style of alternative pleading. By failing to do so, his litigation strategy was not without risk. Healey argues, however, that the "alternative pleading" approach also carried a significant risk factor for G & C. Among other things, Healey contends that if he had proceeded on the theory that G & C was a "charterer" or

that DiIorio had intended to include G & C within the release, Healey would have been compelled at trial to introduce evidence in support of each of these averments. In doing so, he would necessarily have been proving that G & C had much more responsibility than as a mere nominee. Because DiIorio was not contending that G & C was a charterer (despite the allegation in his complaint), Healey believed that the jury would not find that G & C was a charterer and not impose greater liability on it. This was Healey's strategy and, although there may have been another reasonable course of action, "selection of one among several reasonable courses of action does not constitute malpractice." *Rosner, supra,* 492 N.Y.S.2d at 14, 481 N.E.2d 553.

## C. The Defense of Equitable Apportionment

█ The Debtor also asserts that the defendants committed malpractice by failing to interpose the defense of AG & P's equitable share of damages under New York's Civil Practice Law and Rules Article XIV and New York's General Obligations Law ("GOL") § 15–108.[12] In addition, the Debtor contends that malpractice was committed by the defendants' failure to institute a third party action against AG & P for indemnification. *See* Trial Tr. (Feb. 2) at 17–18.

With respect to the applicability of GOL § 15–108, the court in *Swogger v. Waterman S.S. Corp.,* held that where

Federal admiralty law governs ..., it is unnecessary to formally consider whether [defendants] would be entitled to indemnification under State law. However, this Court is constrained to observe that under

the circumstances here indemnification is not barred by § 15–108 of the General Obligation Law.

136 Misc.2d 410, 518 N.Y.S.2d 715, 721 (N.Y.Sup.Ct.1987), *aff'd,* 151 A.D.2d 100, 546 N.Y.S.2d 80 (1989). Indeed, the Debtor's own expert witness conceded at trial that if the underlying action was maritime in nature, the General Obligations Law would not be applicable pursuant to the holding in *Swogger.* Trial Tr. (Feb. 2) at 29–30. Thus, since, for the reasons stated earlier, the DiIorio lawsuit could reasonably be considered maritime in nature, it follows that it was reasonable for the defendants to have concluded that a defense strategy premised upon GOL § 15–108 need not be pursued.

Moreover, despite Debtor's claim that the defendants were negligent in failing to institute a third-party indemnification action against AG & P, its own expert also admitted that he did not know when such a cause of action arises under federal maritime law. Trial Tr. (Feb. 2) at 33–34. In *Marathon Pipe Line v. Drilling Rig Rowan/Odessa,* 761 F.2d 229 (5th Cir.1985), the Fifth Circuit found that under Federal Maritime Law

actions for indemnity and contribution do not finally accrue until the principal defendant is cast in judgment on the principal demand. Because the principal defendant is permitted to bring the third party action even before he is cast in final judgment on the principal demand, it might be concluded ... that the delay is measured from the time a third party action might have been filed. Later Fifth Circuit decisions, however, take judgment day as the starting time.

12. GOL § 15–108 provides:
(a) Effect of release of or covenant not to sue tortfeasors. When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasor to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the

released tortfeasor's equitable share of damages under article fourteen of the civil practice law and rules, whichever is the greatest.
(b) Release of tortfeasor. A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.
(c) Waiver of contribution. A tortfeasor who has obtained his own release from liability shall not be entitled to contribution from the other person.

*Id.*, 761 F.2d at 236; *see also Ebanks v. Great Lakes Dredge & Dock Co.*, 688 F.2d 716, 722 (11th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983) (in a maritime setting, indemnification and contribution survive the main case). Consequently, under federal maritime law, G & C could have sought indemnification or contribution from AG & P after the liability portion of the trial. Since the defendants were discharged immediately after the liability trial, they could not pursue these remedies on behalf of the Debtor.[13]

In any event, even under state law—as G & C's own expert conceded at trial, a claim for indemnity could be brought after the completion of the main suit and there is "no legal compulsion" to bring such a third party action at the commencement of the main case. Trial Tr. (Feb. 2) at 33–34. Nor was it error for the defendants to fail to seek an offset in the damages in the amount of the greater of either the amount stipulated in the release or the percentage of relative culpability attributable to AG & P. First, at the damages portion of the trial, the State Court held that "the defendant is to receive credit for the settlement amount from any award made by this jury." Pl.Exh. 1 at 11. Second, the relative culpability of AG & P could have been litigated after the liability portion of the trial. Third, raising a claim regarding the percentage of culpability is a strategy that carries the risk of unnecessarily confusing the jury. *See, e.g.*, Trial Tr. (Feb. 2) at 123; *see also Ebanks, supra*, 688 F.2d at 722 (apportionment issues should be tried at a different time, in a separate proceeding, "and not as part of the suit by the injured workman").

Accordingly, although defendants could have alleged claims sounding in indemnification and/or contribution, their decision to await the conclusion of the liability portion of the case was a reasonable trial strategy which does not constitute legal malpractice.

### D. The Remaining Claims of G & C

The remaining claims of professional malpractice are wholly unsupported by the record. For instance, the only evidence proffered at trial which relates to Debtor's claim of "valueless pretrial activity" was the testimony of Christopher C. Kirk ("Kirk"), who stated that he had no contact with Healey from 1976 to sometime during jury selection in October 1987. Trial Tr. (Feb. 1) at 81–82. Kirk admitted, however, that he was elevated to performing the duties of president of G & C in or about 1985. *Id.* at 80–81. No evidence was interposed which showed, for example, that Healey had any communications with Malvin Gamborg, G & C's president from 1976 through 1985, or that nothing was done within that time period. To the contrary, there were periodic updates from Healey to Travelers within this time frame.

### E. The Counterclaims

In their counterclaims, Healey and H & M assert that G & C wilfully misrepresented and concealed material facts which was in violation of the cooperation clause of the insurance policy and that G & C intended thereby to injure them by bringing this action. Answer ¶ 38. For the reasons that follow, the Court finds that defendants failed to prove their counterclaims by a preponderance of the evidence.

First, the defendants have no standing to sue on a breach of the cooperation clause because it was not a party to the insurance contract. *See, e.g., Chandler v. H.E. Yerkes and Associates, Inc.*, 784 F.Supp. 119, 123 (S.D.N.Y.1992) ("[T]he principle of privity does limit the rights of parties to maintain suits in the insurance context."); *Velastequi v. Exchange Ins. Co.*, 132 Misc.2d 896, 505 N.Y.S.2d 779, 780–81 (Civ.Ct.1986) (finding no privity of contract between insured and insurer's adjustor). Second, even assuming *arguendo* that the defendants had standing and had proven that the Debtor

---

**13.** Moreover, by choosing (by its new counsel) to argue that the DiIorio lawsuit was one based in non-maritime state law, G & C placed itself in the extremely risky quagmire in which it found itself: *i.e.*, it incurred the risk of (i) having an adverse determination that it had waived the

affirmative defense of release, and (ii) losing its ability to seek indemnification from AG & P. Since this litigation strategy was made by BEJ & H *after* the defendants were discharged as counsel, defendants cannot, and should not, be held responsible.

made misrepresentations and/or concealed material facts, there was absolutely no showing that it was done willfully or intentionally. Moreover, the record is utterly devoid of any evidence which proves that G & C intended to injure the defendants by bringing this action.

### PROPOSED CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 157(a)(1) and (c)(1). This is a noncore proceeding related to a case under Title 11 of the United States Code.

2. The Debtor, Gibson & Cushman Dredging Corp., has not proved, by a preponderance of the evidence, that Defendants, Healey & McCaffrey and Thomas Healey, committed legal malpractice during the course of their representation of the Debtor in connection with the DiIorio litigation in State Court. The Court therefore recommends to the District Court that the second cause of action be dismissed and that judgment be entered in favor of the defendants H & M and Healey.

3. The Defendants, Healey & McCaffrey and Thomas Healey, lack standing to assert a breach of the cooperation clause of the insurance policy between the Debtor and Travelers Insurance Co. The Defendants failed to prove, by a preponderance of the evidence, that the alleged misrepresentations and/or concealment of material facts was done intentionally or willfully. The Court therefore recommends to the District Court that the Defendants' counterclaims be dismissed and that judgment be entered in favor of the Debtor.

In the event that no objections are timely filed pursuant to Fed.R.Bankr.P. 9033(b), counsel for defendants is directed to settle a judgment consistent with this decision.