PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant-Respondent, v DEWEY, BALLANTINE, BUSHBY, PALMER & WOOD et al., Respondents-Appellants, and GILMARTIN, POSTER & SHAFTO, Respondent.

First Department, August 15, 1991

## APPEARANCES OF COUNSEL

*W. Neil Eggleston* of counsel *(William L. Webber* and *Thomas A. Isaacson* with him on the brief; *Hertzjog, Calamari & Gleason,* and *Howrey & Simon,* attorneys), for appellant-respondent.

*Alvin M. Stein* of counsel *(Barry J. Brett* and *Daniel S. Greenfeld* with him on the brief; *Parker Chapin Flattau & Klimpl* of counsel), for Dewey, Ballantine, Bushby, Palmer & Wood, respondent-appellant.

*Nancy Ledy-Gurren* of counsel *(Deborah Bass* with her on the brief; *Bower & Gardner,* attorneys), for respondent.

*Robert L. Conason* of counsel *(Gair, Gair, Conason Steigman & Mackauf,* attorneys), for Haight, Gardner, Poor & Havens, respondent-appellant.

## OPINION OF THE COURT

Ross, J.

The principal issue presented by the appeal and cross appeals is whether the plaintiff has set forth viable causes of action, alleging legal malpractice, as well as breach of contract, so as to preclude defendants' motion to dismiss, and a motion and cross motion for summary judgment.

Prudential Insurance Company of America (Prudential), a New Jersey corporation, doing business in New York State, is engaged in the business of insurance, real estate, financial services, and related businesses.

In 1978, Prudential loaned $150,000,000 (the 1978 loan) to the United States Lines (United), a New Jersey corporation, engaged in the shipping industry, as an owner and operator of merchant vessels. This 1978 loan was secured by, *inter alia,* a first preferred ship mortgage on a number of United's vessels, including eight Lancer Class vessels (Lancers).

Subsequently, in 1982, United entered into a contract for the construction and acquisition of 12 jumbo container vessels (Econships), for which it needed to obtain financing in excess

of $570,000,000. Pursuant to the terms of the 1978 loan, United was unable to finance the Econships without first obtaining Prudential's approval, and therefore United sought such consent, as well as Prudential's participation in the Econship financing. Prudential agreed to participate in the new financial arrangements.

Thereafter, in 1983, Prudential and General Electric Credit Corporation (GECC) jointly provided $114,000,000 of the $570,000,000, needed to finance the Econships. In exchange, Prudential and GECC obtained third preferred ship mortgages on the Econships, and through a trustee, obtained second preferred ship mortgages on the Lancers. As mentioned *supra,* Prudential, alone, held a first preferred ship mortgage on the Lancers, resulting from the 1978 loan.

When the 1983 financing of the Econships was completed, there was still outstanding a principal of $126,859,753.54 on the 1978 loan, and accordingly, Prudential and United agreed to certain changes in that loan agreement. Thereafter, negotiations between those parties resulted in new notes being issued to Prudential in the principal amount of $126,859,753.54, secured by a new single first preferred "fleet" mortgage on the Lancers, plus a fourth preferred ship mortgage on each Econship. Pursuant to the Ship Mortgage Act *(see,* 46 USC §§ 921, 922, which were repealed, eff Jan. 1, 1989), the mortgages were then filed, and recorded with the United States Coast Guard.

United began to experience financial difficulties, and, in 1986, United informed Prudential, GECC and certain of its other key creditors that it anticipated difficulty in meeting its debt obligations. Thereafter, agreements were reached by the parties to restructure the financing of the Econships, as well as the 1978 loan.

It is undisputed that, during the negotiations involved in the 1986 debt restructuring (restructuring), New York law firms represented United, Prudential and GECC, as follows: Gilmartin, Poster & Shafto (Gilmartin) represented United; Dewey, Ballantine, Bushby, Palmer & Wood (Dewey) represented Prudential; and Haight, Gardner, Poor & Havens (Haight) represented GECC. Prudential and Dewey further allege that Haight represented Prudential as "special admiralty counsel".

A partner in the Haight firm states, in an affidavit, "[i]t was necessary for a multitude of documents to be drafted, circu-

lated and executed in [connection with the restructuring], and [therefore] document drafting was shared among the different partys' [sic] law firms".

The restructuring of the 1978 loan was accomplished through Amendment No. 1986-1 (Amendment), amending the Financing and Security Agreement executed in 1978. Our examination of the preliminary statement on the first page of this Amendment indicates that it correctly states that the outstanding principal amount remaining, as to the 1978 debt, was "$92,885,000.00". Further, as a Corollary to the Amendment, Prudential and United also executed an amendment to the first preferred "fleet" mortgage on the Lancers held by Prudential, and this document was identified as Amendment No. 1 (Corollary).

Our examination of the subject Corollary indicates an error, in that it reflects that Prudential's mortgage had an outstanding balance of $92,885 rather than the correct amount of $92,885,000. Haight's staff prepared this Corollary containing the approximately $92 million error, and it admits that the "typographical error [occurred] on a word processor in [Haight's] office".

None of the parties or their counsel detected the typographical error before the closing took place, on April 14, 1986, and thereafter, on April 15, 1986, the Amendment and Corollary were filed and recorded with the United States Coast Guard.

Subsequently, in November 1986, United filed bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York. Following United's bankruptcy filing, in May 1987, Prudential sought to have the Bankruptcy Court lift the automatic stay, in order that Prudential could foreclose on its $92,885,000 first preferred "fleet" mortgage on the Lancers. United, as well as some of the other creditors of United, opposed, claiming that Prudential's interest in those vessels was only in the recorded amount of $92,885.

Although the Bankruptcy Court lifted the stay, as to five Lancers in New York Harbor, permitting Prudential to arrest and pursue foreclosure on those vessels, that court did not permit Prudential to retain the proceeds from the sale of those vessels. Thereafter, in March 1988, Prudential and debtor United reached an agreement, by which United abandoned its opposition to Prudential's claim of a first preferred "fleet" mortgage in the amount of $92,885,000, in exchange

for a 17.5% share of the amounts Prudential would receive from the sale of the Lancers. By order, dated March 24, 1988, Bankruptcy Court approved this Prudential/United settlement.

During August 1987, Prudential commenced in rem foreclosure proceedings on its interest in the Lancers in the United States District Court for the Northern District of New York, and, in that court, GECC, as a creditor of United, moved for partial summary judgment, declaring Prudential's mortgage to be invalid for any amount over $92,885. Subsequently, this matter was transferred to the United States District Court for the Southern District of New York, where Prudential crossmoved for summary judgment, declaring the value of its mortgage to be $92,885,000. The District Court denied GECC's motion, and granted Prudential's cross motion *(see, Prudential Ins. Co. v S. S. Am. Lancer,* 686 F Supp 469 [1988]). GECC appealed, and the United States Court of Appeals for the Second Circuit affirmed *(see, Prudential Ins. Co. v S. S. Am. Lancer,* 870 F2d 867 [1989]).

While we find it clear from the record that both United and GECC knew that the correct amount of Prudential's mortgage interest in the Lancers was $92,885,000 rather than $92,885, under the peculiarities of the bankruptcy and maritime law those parties could challenge the amount of that mortgage, even though they had actual knowledge of the facts *(see,* 1978 Bankruptcy Code [11 USC] § 506 [c]; 46 USC, Appendix § 922). United, as debtor-in-possession, claimed in its adversary proceeding, in Bankruptcy Court, that "as a hypothetical creditor holding an unsatisfied execution under section 544 (a) (2) of the Bankruptcy Code, it may avoid $92,792,115.00 of the First Mortgage, preserving the benefit of the avoided transfer for its estate and creditors under section 551 of the Bankruptcy Code [United] asserts that such portion of the First Mortgage was not properly recorded by Prudential because of the typographical error which reduced the amount of the First Mortgage to $92,885.00 from $92,885,000.00 [United] has asserted that the reduced amount, which appears in the Coast Guard's index of mortgage documents and on the Vessels' documents constitutes the extent to which Prudential's First Mortgage is properly recorded under the Ship Mortgage Act". Further, GECC claimed, in its litigation against Prudential, "that the figure $92,885.00, the amount recorded on the Lancer vessel documents, controls. GECC [in addition] claims that the provisions of 46 U.S.C. § 922 must be strictly construed, and that

any deviation leads to the loss of preferred status for a ship mortgage".

By summons and complaint, in September 1989, Prudential (plaintiff) commenced an action for negligence, legal malpractice, and breach of contract against Dewey, Gilmartin and Haight (defendants). The complaint alleges, in substance, that the defendants' conduct caused plaintiff's mortgage interest in the eight Lancers to be erroneously documented and recorded as $92,885. Further, plaintiff seeks recovery of five elements of damages it suffered as a result of the error in the mortgage documents: (1) the costs of defending the United litigation, (2) the payment plaintiff made to settle the United litigation, (3) the extra ship dockage and maintenance expenses plaintiff incurred during the delay in selling the ships, (4) the loss of investment or interest income resulting from delay in plaintiff's receipt of the proceeds from the sale of the ships, and (5) the costs of defending the later GECC litigation in the Admiralty Courts.

Following the joinder of issue, defendant Dewey moved, pursuant to CPLR 3211 (a) (7), to dismiss from the complaint that element of the damages, seeking recovery of the amount paid by plaintiff to settle with United, and defendant Gilmartin moved and defendant Haight cross-moved for summary judgment, dismissing the complaint. The IAS court disposed of those motions, by granting defendant Dewey's motion, only insofar as to dismiss the settlement as an element of damages in the first cause of action for negligence and legal malpractice, granting defendant Gilmartin's motion for summary judgment, and denying defendant Haight's cross motion for summary judgment, with leave to renew. Prudential appeals, and defendants Dewey and Haight separately cross-appeal.

It is well established law that "[a]n action for legal malpractice requires proof of three essential elements: (1) the negligence of the attorney; (2) that the negligence was the proximate cause of the loss sustained; and (3) proof of actual damages (see *Creative Inception v Andrews,* 50 AD2d 553)" *(Mendoza v Schlossman,* 87 AD2d 606-607 [1982], *appeal withdrawn* 57 NY2d 778 [1982]; *O'Brien v Spuck,* 99 AD2d 910, 911 [1984]).

Recently, we stated, in *Bernstein v Oppenheim & Co.* (160 AD2d 428, 430 [1st Dept 1990]), that "[a]n attorney is liable in a malpractice action if it can be proved that his conduct fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession".

Although the issue "whether specific conduct constitutes [legal] malpractice normally requires a factual determination to be made by the jury" *(Grago v Robertson,* 49 AD2d 645, 646 [1975]), the issue whether a pleading sufficiently states a cause of action for legal malpractice poses "a question of law which [can] be determined on a motion to dismiss" *(Rosner v Paley,* 65 NY2d 736, 738 [1985]).

Since defendant Dewey has moved to dismiss, the law has long been settled that a court, when deciding such a motion, must consider the plaintiff's allegations, asserted in the complaint submitted in opposition to that motion, "as true and resolve all inferences which reasonably flow therefrom in favor of the pleader" *(Sanders v Winship,* 57 NY2d 391, 394 [1982]; *see also, Kaufman v Kaufman,* 135 AD2d 786, 787 [1987]; *Apple Records v Capitol Records,* 137 AD2d 50, 59 [1st Dept 1988]).

New York courts have consistently indicated in their decisions that "[t]he fundamental principle of damages, whether the action is one for breach of contract or for a negligent act or omission, is fair and just compensation, commensurate with the loss or injury sustained from the wrongful act complained of" *(see,* 36 NY Jur 2d, Damages, § 9).

More than 70 years ago the Court of Appeals stated that an injured party has an obligation to make a reasonable effort to minimize damages. Specifically, in *Den Norske Ameriekalinje Actiesselskabet v Sun Print. & Publ. Assn.,* 226 NY 1, 7 [1919]), the Court of Appeals held "[t]he rule is of general and widespread application that one who has been injured either in his person or his property by the wrongful act or default of another is under an obligatory duty to make a reasonable effort to minimize the damages liable to result from such injury, and that if he does not make such reasonable effort he will be debarred from recovering for those additional damages which result from such failure". The courts of this State continue to apply this rule *(see, Wilmot v State of New York,* 32 NY2d 164, 169 [1973], *rearg denied* 33 NY2d 657 [1973]; *McLaurin v Ryder Truck Rental,* 123 AD2d 671, 673 [1986]).

Our examination of the complaint indicates that the plaintiff alleges that the proximate cause of United's challenge to the subject mortgage was the defendants' legal malpractice, causing that mortgage to incorrectly reflect that plaintiff's interest as $92,885 instead of $92,885,000. Since the mortgage was documented and recorded with the Coast Guard, United

contended, in the Bankruptcy Court, "that the reduced amount * * * constitutes the extent to which Prudential's First Mortgage is properly recorded under the Ship Mortgage Act". Further, plaintiff alleges in the complaint that, "if [plaintiff] had not settled the dispute with [United], [plaintiff] would have incurred substantial additional legal fees in litigating the dispute, risked the loss of any recovery from the Lancer Vessels, and further delayed its receipt of proceeds from the sale of the ships to its further financial loss".

As of the date of the complaint, September 27, 1989, plaintiff alleges that it had paid approximately $11,446,273 to United in settlement, since that sum is 17.5% of the net proceeds of approximately $65,407,276, resulting from the sale of the Lancers.

The fact pattern herein is unlike that found in the usual legal malpractice action, since plaintiff does not claim that defendants mishandled litigation and lost a case, which should have been won. Rather, plaintiff claims that defendants' legal malpractice caused third parties, United and GECC, to bring legal challenges against the $92,885,000 mortgage interest of plaintiff. Regardless of the legal malpractice fact pattern, the triable issue of fact is the same: did the defendant's conduct fall "below the ordinary and reasonable skill and knowledge commonly possessed by a member of his [or her] profession" *(Grago v Robertson, supra,* at 646).

■ Based upon our review of the proceedings in the Federal courts, relative to the challenges of United and GECC to the mortgage, we find triable issues of fact are presented, as to whether it was reasonable for plaintiff to settle, rather than further litigate, for the purpose of minimizing damages, and whether that settlement was reasonable *(see, 9th Ave. & 42nd St. Corp. v Zimmerman,* 217 App Div 498, 500-501 [1st Dept 1926]; *Lewis v Alper,* 15 AD2d 795, 796 [1962]). We further find that the IAS Court erred in granting defendant Dewey's motion to dismiss the settlement as an element of damages.

■ After reviewing the plaintiff's second cause of action for breach of contract, alleging that defendants failed in their obligation to protect plaintiff's mortgage interest in the Lancers, and such breach was the proximate cause of the damages claimed, we hold that plaintiff has stated a viable cause of action for breach of contract. Further, "[u]nder each cause of action for malpractice and breach of contract, the claimed damage is to property or pecuniary interests and the asserted

liability alleges a failure to use due care and had its genesis in the contractual relationship of the parties * * * [and therefore] this conduct [serves] as the basis for contract liability" *(Bloom v Kernan,* 146 AD2d 916, 917 [1989]).

Dewey argues that this being an indemnification case, Dewey was entitled to notice.

■ Since our analysis of the allegations of the complaint indicates that plaintiff seeks damages, based upon causes of action for negligence, legal malpractice and breach of contract, and not indemnification, pursuant to either an express or implied agreement, we find that, unlike in an indemnification case *(see, Feuer v Menkes Feuer, Inc.,* 8 AD2d 294, 299 [1st Dept 1959]; *Kaye Assocs. v Libov,* 139 AD2d 440 [1st Dept 1988]),* where the party seeking indemnification usually must give notice to the defendant of the claims against him or her, the plaintiff was under no obligation to give defendants an opportunity to either participate in the settlement negotiations or in the defense against United's claim.

Although there is no evidence that plaintiff gave formal notice of United's claim to Dewey, who had represented plaintiff in the 1986 restructuring, we note in passing that United's claim received nationwide publicity *(see,* record on appeal for copies of representative articles, appearing, during the period from July 31, 1987 to Mar. 29, 1988, in an Associated Press release, the New York Times, the Washington Post, and the Manhattan Lawyer). Incidentally, since we find in the Associated Press release, dated July 31, 1987, that a partner of defendant Dewey stated " 'It's such an obvious error that we would think that the courts would protect Prudential [plaintiff] on it. Beyond that I don't think I can really say much' ", we reasonably conclude that defendant Dewey had knowledge of United's claim soon after same was asserted.

Examination of the complaint indicates that plaintiff alleges that Gilmartin is liable, since, although it is undisputed that Gilmartin represented United in the 1986 loan restructuring, Gilmartin committed legal malpractice by furnishing an opinion letter to plaintiff. Section Four, subdivision B, paragraph (i) of the 1986 Amendment to the Financing and Security Agreement, executed in 1978, by United and Prudential, relative to the 1978 loan, states that a condition precedent to the effectiveness of the Amendment was the furnishing of a favorable opinion letter by Gilmartin to plaintiff "to such effect as shall be satisfactory to [plaintiff]". Gilmartin furnished such a letter, dated April 14, 1986, to plaintiff.

Plaintiff, in substance, advances two theories to support its contention that Gilmartin is liable. First, privity was allegedly established between plaintiff and Gilmartin, representing United, since Gilmartin knew that plaintiff would rely on the accuracy of the opinion letter, when plaintiff executed, in 1986, the mortgage documents containing the $92 million error. Second, plaintiff allegedly was a third-party beneficiary of Gilmartin's contract to provide legal services to United, since, pursuant to that contract, Gilmartin was required to submit an opinion letter to plaintiff for plaintiff's benefit.

In this State "[t]he general rule is that absent fraud, collusion, malicious acts or other special circumstances, an attorney is not liable to third parties, not in privity, for harm caused by professional negligence *(see, e.g., Estate of Spivey v Pulley,* 138 AD2d 563; *Viscardi v Lerner,* 125 AD2d 662; *National Westminster Bank v Weksel,* 124 AD2d 144, *lv denied* 70 NY2d 604; *Rossi v Boehner,* 116 AD2d 636, *cf., Credit Alliance Corp. v Andersen & Co.,* 65 NY2d 536, *mot to amend remittitur granted* 66 NY2d 812)" *(Associated Factors Corp. v O'Neill Detective Agency,* 146 AD2d 728 [1989]).

The Court of Appeals recently held that, in order to state a cause of action for negligent representation, resulting only in economic injury, "such a cause of action requires that the underlying relationship between the parties be one of contract or the bond between them so close as to be the functional equivalent of contractual privity" *(Ossining Union Free School Dist. v Anderson LaRocca Anderson,* 73 NY2d 417, 419 [1989]).

■ Our examination of the subject opinion letter does not indicate any express or reasonably implied promise by Gilmartin that it would independently review for accuracy documents prepared by others. For example, in that letter, Gilmartin writes, in pertinent part, that, in connection with the 1986 restructuring of the 1978 loan, "we have examined such certificates of public officials, such certificates of officers of the Company [United], and such corporate documents and records of each of the foregoing (originals or copies certified to our satisfaction), as we have considered necessary or appropriate as a basis for our opinion hereinafter set forth. In rendering such opinion we have relied upon such certificates of public officials and such officers and upon such corporate documents and records with respect to the accuracy of material factual matters which were not independently established as well as the representations and warranties in each of the documents referred to above".

The partner of Gilmartin, who prepared the opinion letter, states, in an affidavit submitted in support of Gilmartin's motion for summary judgment, that "[s]ince I did not regard the Gilmartin Firm as having any responsibility for proper recording and endorsement of the Corollary Ship Mortgage Amendment (our opinion was made subject to recordation and endorsement duly being effected), I saw no reason to scrutinize the evidence of recording and endorsement which were obtained by counsel [Haight] for GECC and [plaintiff]".

In *Port Chester Elec. Constr. Corp. v Atlas* (40 NY2d 652, 655 [1976]), the Court of Appeals stated "[i]t is old law that a third party may sue as a beneficiary on a contract made for his benefit. * * * However, an intent to benefit the third party must be shown * * * and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts."

We agree with the IAS court that plaintiff's argument, that Gilmartin's motion for summary judgment should be postponed, pending the completion of discovery, lacks merit, since plaintiff "has not established any essential facts nor pinpointed any documents that might be obtained from discovery".

Repeatedly it has been held that " 'to defeat a motion for summary judgment the opposing party must "show facts sufficient to require a trial of any issue of fact" (CPLR 3212, subd [b])' " *(Zuckerman v City of New York,* 49 NY2d 557, 562 [1980]; *Mom's Bagels v Greenbaum,* 164 AD2d 820, 823 [1st Dept 1990], *appeal dismissed* 77 NY2d 902 [1991]).

Based upon our analysis of the facts and legal authority, *supra,* we find that plaintiff lacks privity with Gilmartin, in that there is not a "bond between them so close as to be the functional equivalent of contractual privity" *(Ossining Union Free School Dist. v Anderson LaRocca Anderson, supra),* and that plaintiff "is merely an incidental beneficiary with no right to enforce the particular [contract]" *(Port Chester Elec. Constr. Corp. v Atlas, supra,* at 655). In view of our finding that there is no material triable issue of fact, Gilmartin's motion for summary judgment is granted.

Defendant Haight's cross motion for summary judgment is opposed by both plaintiff and codefendant Dewey. As discussed *supra,* Haight admits that the $92 million error occurred in its office, when it was preparing its share of the documents for the 1986 restructuring.

■ On the basis of documentary evidence, Dewey contends that Haight acted as special admiralty counsel for plaintiff during the 1983 transaction regarding the refinancing of the Lancers, and continued to act in that capacity during the period from June 1984 to September 23, 1985. This documentary evidence consists of copies of opinion letters issued by Haight, in which they acknowledge that role.

In addition, defendant Dewey offers an affidavit of one of its partners, who states that Haight also acted as special admiralty counsel for plaintiff in the 1986 restructuring. Specifically, that attorney states: "I was advised by the Dewey * * * attorney present that the execution of the ship mortgage amendments by [plaintiff's] representatives took place in Haight * * * offices and under [Haight's] direct supervision. In all of these matters, so far as I am aware, Haight * * * purported to be acting in a manner designed to protect [plaintiff's] interests. I always understood Haight * * * to be doing so and relied on it to act on behalf of [plaintiff] in connection with the preparation of the ship mortgages".

Haight argues that further evidence that it did not represent plaintiff is indicated by the fact that it was not paid by plaintiff for the preparation of the mortgage. However, the Dewey affidavit, *supra,* indicates that all of the attorneys, as is a common practice, were paid by the borrower.

Further, an attorney, who was an assistant general counsel in the plaintiff's law department at the time of the 1986 restructuring, also submitted an affidavit in opposition to Haight's cross motion, and she states, in pertinent part, "[d]ocuments in [plaintiff's] files indicate that Haight did not prepare ship mortgage amendments for all of the four groups of secured lenders involved in the 1986 restructuring, namely, the shipbuilder, the banks, [plaintiff], and GECC. Instead, those documents indicate that Haight prepared only those mortgage amendments that protected solely [plaintiff's] interests or that protected jointly [plaintiff's] and GECC's interests".

Based upon our examination of the submissions by the parties, we find that there is a material triable issue of fact as to whether Haight continued to represent plaintiff, during the 1986 restructuring of the loan. Therefore, we further find that Haight's cross motion for summary judgment should be denied.

We have considered the other contentions of the parties, and find them to be without merit.

Accordingly, order, Supreme Court, New York County (Karla Moskowitz, J.) entered December 5, 1990, which, *inter alia,* granted defendant Dewey's motion to dismiss, only insofar as to dismiss the settlement as an element of damages in the first cause of action for negligence and legal malpractice, granted defendant Gilmartin's motion for summary judgment, and denied defendant Haight's cross motion for summary judgment, is modified, on the law and on the facts, to the extent of denying defendant Dewey's motion to dismiss the settlement as an element of damages in the first cause of action, and, except as so modified, otherwise affirmed, without costs.

SULLIVAN, J. P., MILONAS, KASSAL and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered on December 5, 1990, unanimously modified, on the law and on the facts, to the extent of denying defendant Dewey, Ballantine's motion to dismiss the settlement as an element of damages in the first cause of action and except as so modified, otherwise affirmed, without costs.