[753 NYS2d 482]

Tova Schwartz, Appellant, v Olshan Grundman Frome & Rosenzweig et al., Respondents.

First Department, January 16, 2003

194

## APPEARANCES OF COUNSEL

*Joseph Zelmanovitz* of counsel (*Stahl & Zelmanovitz*, attorneys), for appellant.

*Thomas J. Fleming* of counsel (*Barbara R. Shweky* on the brief; *Olshan Grundman Frome Rosenzweig & Wolosky LLP*, attorneys), for respondents.

## OPINION OF THE COURT

NARDELLI, J.P.

In this appeal, we are asked to determine, inter alia, whether the motion court properly dismissed plaintiff's claims for legal malpractice and breach of fiduciary duty where defendants were purportedly negligent in failing to ensure the transfer of certain employment agreements in connection with the sale of a corporation, resulting in devastating business losses to plaintiff.

Plaintiff Tova Schwartz, in October 1991, founded Light Savers USA, Inc. (Light Savers), a New York corporation which was in the business of producing and marketing decorative, energy-efficient light fixtures. Schwartz, who served as Light Savers' President and Chief Executive Officer, took the company public in January 1994 with an initial offering of 1,250,000 shares of common stock at a price of $3 per share. Schwartz, however, retained a controlling interest in Light Savers, holding 53% of its outstanding common stock.

In or about May 1995, Light Savers entered into a letter of intent to purchase the assets and business operations of A.G.F. Interior Services Company, doing business as Hospitality Restoration and Builders (AGF), a Florida corporation engaged in

providing hotel restoration services, from Watermark Investments, Ltd. (Watermark), AGF's sole shareholder. The sale was eventually consummated pursuant to an asset purchase agreement (the Purchase Agreement) dated August 1, 1995. Plaintiff maintains that defendant Robert Friedman, a partner of defendant Olshan Grundman Frome & Rosenzweig (collectively to be referred to as Olshan), represented both herself and Light Savers throughout the negotiations and sale of AGF, whereas Olshan claims that it only represented Light Savers.

The Purchase Agreement provides, inter alia, that Light Savers would receive all of AGF's assets in exchange for a promissory note in the amount of $3,500,000 and 2,500,000 shares of Light Savers stock; and that Watermark was to purchase, from plaintiff personally, 500,000 shares of Light Savers stock at $4 per share and, if it failed to fulfill that obligation, Watermark would be deemed in default and be required to pay plaintiff $1 million in liquidated damages. The liquidated damages provision was subsequently referred to in a letter dated August 17, 1995, in which Light Savers guaranteed Watermark's obligation to plaintiff and provided:

> "In addition, in order to assure that you the Obligor is able to fulfill its obligations to you pursuant to the preceding paragraph, each Obligor shall endeavor to provide you with security for its performance, such security may include the filing of a UCC-1 Financing Statement and the placement of cash and/or securities in escrow."

The letter was agreed to and accepted by plaintiff.

Plaintiff contends, with no real dispute from defendants, that the two primary assets of AGF were the services of two key employees, Alan Friedberg, AGF's Chief Executive Officer, and Guillermo Montero, its Senior Vice-President, who, as "the essence of AGF's business," were responsible for contacts with major hotel chains and the operation of the renovation business. Plaintiff avers, again without dispute, that without their continued employment, AGF would essentially be worthless. Consequently, plaintiff purportedly directed Olshan to ensure that employment agreements with noncompetition provisions were in place with Friedberg and Montero which would be enforceable by Light Savers. Friedman is alleged to have informed plaintiff, as well as Moise Hendeles, a member of the Board of Directors of Light Savers, that the agreements with Friedberg and Montero were "ironclad."

In fact, both Friedberg and Montero had executed employment agreements in May 1995, neither of which referred to the sale of AGF's assets to Light Savers except to state that the agreements would terminate upon payment in full of the promissory note given by AGF to Light Savers. Defendants had endeavored to draft subsequent employment agreements which provided for Friedberg's and Montero's continued employment by Light Savers, as AGF's parent, but those agreements, although drafted, were never signed. Indeed, in deposition testimony, Jill Citron, Esq., a former associate at Olshan who drafted the unsigned employment agreements, testified that the unsigned agreements were designed to guaranty "that [Friedberg and Montero] were employed, they wanted to make sure that they were locked up and employed by the company * * *." Ms. Citron went on to testify that "the structure of the deal was that [Light Savers and plaintiff] were buying the assets, and the assets I think weren't worth much without having these guys to run the business."

By letter dated November 30, 1995, Friedberg advised plaintiff of his resignation, citing to the fact that she had failed to attempt to negotiate a contract with him and failed to deliver the 300,000 options which were to be issued with the acquisition. Plaintiff responded by letter dated December 1, 1995, in which she opined that she considered Friedberg's resignation to be part of a scheme to coerce Light Savers to succumb to outrageous demands and that his employment agreement, including the noncompetition provisions, was still in effect. Montero's resignation was submitted shortly thereafter.

Plaintiff then contacted Light Savers' new counsel, Cooperman Levitt, in order to determine whether Friedberg's and Montero's position was valid. In an affirmation dated January 21, 2001, Elliot Brecher, Esq., of that firm opined that it was unlikely that any rights under the employment contracts were acquired by Light Savers pursuant to the Purchase Agreement. Plaintiff further maintains that upon their resignation, Friedberg and Montero were joined by Watermark's chairman in insisting that the price for retaining the latter's employment was: plaintiff's resignation; plaintiff relinquishing her control of Light Savers; and plaintiff waiving her right to the $1 million in liquidated damages from Watermark. If plaintiff failed to comply, Friedberg and Montero stated they would leave, start their own business, and take the hotel renovation contracts with them, rendering Light Savers worthless. Plaintiff claims that Watermark's chairman informed her that

without Friedberg and Montero, she could keep her shares in Light Savers "and use it as toilet paper."

Plaintiff, as a result of the foregoing, avers that she had no choice but to mitigate her damages and on February 26, 1996, she entered into a divestiture, settlement and reorganization Agreement (the Divestiture Agreement). The Divestiture Agreement, inter alia, required plaintiff to resign as an officer and director of Light Savers, to release Watermark from its obligation to purchase 500,000 of her shares at $4 per share, instead receiving $.50 per share for the same 500,000 shares, resulting in a loss of $1,750,000, and to waive the $1 million liquidated damages provisions in the Purchase Agreement.

Plaintiff subsequently commenced this action in April 1998 alleging, in the first cause of action, that in failing to obtain binding, enforceable employment agreements from Friedberg and Montero, Olshan committed malpractice resulting in personal losses well over the $1 million liquidated damages provided for in the Purchase Agreement. The second cause of action asserts that defendants breached their fiduciary duty to plaintiff in representing both her and Light Savers in the Purchase Agreement, and then representing Light Savers against her in a subsequent litigation arising out of plaintiff's obligation, set forth in the Divestiture Agreement, to sell the Light Savers stock in her possession to Light Savers. The third cause of action alleges negligent misrepresentation; the fourth cause of action alleges negligent infliction of emotional distress; and the fifth cause of action sounds in breach of contract. The motion court granted defendants' motion for summary judgment and dismissed the complaint.

The motion court opined that the "lynch pin" to this action is whether the employment agreements were enforceable, and held, after reviewing the Purchase Agreement, that they were, in fact, enforceable and that as a result, plaintiff could not establish the "but for" element of a malpractice claim. With regard to the breach of fiduciary duty claim, the court found that defendants did not breach such duty by failing to obtain security for Watermark's obligation to pay plaintiff $2 million for her stock, or $1 million in liquidated damages pursuant to the Purchase Agreement, or by representing Light Savers in the litigation to enforce the Divestiture Agreement, as defendants had not represented any of the parties in negotiating that agreement, which was separate and distinct from the Purchase Agreement. Finally, the motion court dismissed the third and fifth causes of action as redundant of the malpractice

claim, and the fourth cause of action as insufficient. We disagree as to the malpractice claim only, and reinstate that claim.

It is well established that an action for legal malpractice requires proof of three elements: the negligence of the attorney; that the negligence was the proximate cause of the loss sustained; and proof of actual damages (*Between The Bread Realty Corp. v Salans Hertzfeld Heilbronn Christy & Viener*, 290 AD2d 380, *lv denied* 98 NY2d 603; *Prudential Ins. Co. of Am. v Dewey, Ballantine, Bushby, Palmer & Wood*, 170 AD2d 108, 114, *affd* 80 NY2d 377). In order to demonstrate proximate cause, plaintiff must establish that but for the attorney's negligence, plaintiff would have prevailed in the matter in question or would not have sustained any ascertainable damages (*Senise v Mackasek*, 227 AD2d 184, 185; *Stroock & Stroock & Lavan v Beltramini*, 157 AD2d 590, 591). The failure to establish proximate cause requires dismissal of the legal malpractice action, regardless of whether it is demonstrated that the attorney was negligent (*Tanel v Kreitzer & Vogelman*, 293 AD2d 420, 421; *Pellegrino v File*, 291 AD2d 60, 63, *lv denied* 98 NY2d 606).

In the matter at bar, while we agree with the motion court that the pivotal issue is the enforceability of the employment contracts under the Purchase Agreement, an issue not seriously in dispute, we disagree with the motion court to the extent that we find the Purchase Agreement to be ambiguous.

Initially, we note that the Purchase Agreement does not delineate the employment agreements as assets of AGF, or in any way indicate that the employees agreed to be bound by Light Savers after it absorbed AGF. The motion court found, and defendants argue, however, that the employment agreements were conveyed as contractual obligations pursuant to section 1.1.1 of the Purchase Agreement. That provision, entitled "Purchased Assets," provides, in relevant part, that:

> "The assets purchased hereunder ('the Assets') shall consist of those properties, assets and rights described below, which relate to the Seller's business of marketing, selling, contracting and constructing, renovation, restoration and rehabilitation projects in the hospitality industry, * * * and such Assets, except as excluded and set forth on Schedule 1.1.2, include:

> "(i) current and fixed assets, including machinery, equipment, tools, furniture and fixtures;

"(ii) all rights, benefits and interests under all contracts, purchase orders, transferable permits * * *

"*All such Assets are listed with more particularity* in the following schedules attached hereto: * * *

"*Schedule 1.1.1E Contracts * * *"* (emphasis added).

Schedule 1.1.1E, under the heading "Executed Contracts," makes no mention of the employment agreements.

Moreover, the fact that the employment agreements are listed as contractual obligations in section 4.13 is inconclusive, as that provision does not contain any language purporting to convey those obligations to Light Savers. Finally, we disagree with the motion court's conclusion with regard to section 4.16 of the Purchase Agreement, which is entitled "Benefit Plans," as that provision has no bearing, that we can discern, on the employment agreements. Accordingly, since it is inconclusive whether the employment agreements were enforceable, and in light of the importance of those agreements to the viability of Light Savers, we find that issues of fact exist as to whether defendants were negligent and whether their conduct was a proximate cause of plaintiff's damages (*see Pfeffer v Pernick*, 268 AD2d 262; *Estate of Nevelson v Carro, Spanbock, Kaster & Cuiffo*, 259 AD2d 282).

■ The motion court properly dismissed plaintiff's claim for breach of fiduciary duty. The violation of a disciplinary rule does not, without more, generate a cause of action (*Swift v Ki Young Choe*, 242 AD2d 188, 192). Here, Olshan's alleged dual representation of plaintiff and Light Savers in the negotiations leading up to the execution of the Purchase Agreement, purportedly in violation of Code of Professional Responsibility DR 5-105 (22 NYCRR 1200.24), does not, without more, support plaintiff's claim. In addition, Olshan's representation of Light Savers in its action against plaintiff to enforce the Divestiture Agreement does not support plaintiff's cause of action as defendants did not represent any of the parties when the Divestiture Agreement was executed, and plaintiff is unable to identify any confidential information improperly utilized by Olshan which would support a claim for breach of fiduciary duty.

Plaintiff's breach of contract and negligent misrepresentation claims were properly dismissed by the motion court as redundant of the malpractice cause of action (*see Between The*

*Bread Realty Corp. v Salans Hertzfeld Heilbronn Christy & Viener, supra* at 381; *Leather v United States Trust Co. of N.Y.*, 279 AD2d 311). Finally, we agree with the motion court that plaintiff's claim for negligent infliction of emotional distress should be dismissed because it fails to allege conduct "so extreme in degree and outrageous in character as to go beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community" (*Naturman v Crain Communications*, 216 AD2d 150, 150; *Hernandez v City of New York*, 255 AD2d 202).

Accordingly, the order of the Supreme Court, New York County (Alice Schlesinger, J.), entered August 24, 2001, which granted defendants' motion for summary judgment and dismissed the complaint, should be modified, on the law, the cause of action for legal malpractice reinstated, and otherwise affirmed, without costs.

MAZZARELLI, ROSENBERGER, LERNER and MARLOW, JJ., concur.

Order, Supreme Court, New York County, entered August 24, 2001, modified, on the law, the cause of action for legal malpractice reinstated, and otherwise affirmed, without costs.