■ KRISTIN KAHKONEN DUPREE, Respondent-Appellant, v JAMES E. GIUGLIANO, Appellant-Respondent. [929 NYS2d 305]—

A jury verdict should not be set aside as contrary to the weight of the evidence unless the jury could not have reached its verdict on any fair interpretation of the evidence (*see Acosta v City of New York*, 84 AD3d 706 [2011]; *Ferreira v Wyckoff Hgts. Med. Ctr.*, 81 AD3d 587, 588 [2011]; *see generally Nicastro v Park*, 113 AD2d 129 [1985]).

In this case, the plaintiff sought to recover damages for medical malpractice and, thus, was required to prove that the defendant's deviation from good and accepted medical practice proximately caused her injuries (*see Alvarez v Gerberg*, 83 AD3d 974, 975 [2011]; *Stukas v Streiter*, 83 AD3d 18, 23 [2011]; *Myers v Ferrara*, 56 AD3d 78, 83 [2008]). The credible evidence at trial established that the plaintiff sought and obtained treatment from the defendant for, among other things, mental health issues, and that, during and after the course of the treatment for mental health issues, the defendant and the plaintiff became involved with each other sexually for a period of approximately nine months. As our dissenting colleague points out, after the sexual relationship began, and concurrently with it, the plaintiff was also treated by a therapist whom the defendant recommended. The plaintiff disclosed to that therapist that she was having an affair, but she did not disclose that the affair was with the defendant since, as the plaintiff explained at trial, the therapist and the defendant were friends. The jury found that the defendant's conduct departed from good and accepted medical practice, and that this departure proximately caused the plaintiff to suffer emotional distress and economic loss. The jury found that the defendant was 75% at fault and the plaintiff was 25% at fault with respect to the plaintiff's injuries. The jury also awarded the plaintiff punitive damages in the sum of $166,000.

The plaintiff made a prima facie showing at trial that the defendant committed medical malpractice. Moreover, the jury's verdict on the issue of liability was supported by a fair interpretation of the evidence and, thus, was not contrary to the weight of the credible evidence (see Capwell v Muslim, 80 AD3d 722, 723 [2011]; Morales v Interfaith Med. Ctr., 71 AD3d 648, 649 [2010]). The plaintiff's expert testified that because of the particularly sensitive nature of the relationship between a mental health provider and a patient, including the emotional dependence of the patient on the provider, a sexual relationship between the patient and the provider is very likely to harm the patient. Consequently, a sexual relationship between a mental health provider and a patient is a departure from the standard of care, whether it is characterized as part of the treatment or independent of it, and it is a departure even when it takes place after the treatment has ended (see Noto v St. Vincent's Hosp. & Med. Ctr. of N.Y., 142 Misc 2d 292, 295-296 [1988], affd 160 AD2d 656 [1990]; Weaver v Union Carbide Corp., 180 W Va 556, 557-558, 378 SE2d 105, 106-107 [1989]; Bunce v Parkside Lodge of Columbus, 73 Ohio App 3d 253, 260, 596 NE2d 1106, 1110-1111 [1991]; cf. Dillon v Callaway, 609 NE2d 424, 427-428 [Ind 1993]; Mazza v Huffaker, 61 NC App 170, 174-177, 300 SE2d 833, 837-838 [1983]; see generally Louisell & Williams, Medical Malpractice § 17A.11 [2011]). Here, the plaintiff relied on the defendant for treatment, medication, and "talk therapy" relating to mental health issues arising, at least in part, out of problems she was having in her marriage. Her sexual relationship with the defendant began while that mental health treatment was continuing, and it clearly had an impact upon the plaintiff's level of trust and openness with her other therapist. That the plaintiff acknowledged that the sexual relationship between the defendant and her was not "part of the treatment" does not mitigate the breach of trust and, thus, does not mitigate the defendant's breach of duty. According to the expert testimony adduced by the plaintiff, it was entirely foreseeable that "eroticized transference"—in which the doctor becomes, for the patient, "a very sexually charged figure"—would occur as a result of the treatment. Rather than competently dealing with that transference, as the applicable standard of care requires, the defendant exploited it.

Relying primarily on Gross v Kurk (224 AD2d 582 [1996]), our dissenting colleague reiterates the generally unobjectionable proposition that a doctor's sexual relationship with his or her patient is not malpractice unless the sexual relationship was part of, or related to, treatment. The physician in that case, however, was an allergist, who limited his treatment of the

plaintiff to twice-weekly allergy shots. A mental health provider's duty is different, and a sexual relationship between that provider and a patient violates the trust that lies at the heart of the relationship. Finally, it is irrelevant that the defendant was not actually a psychiatrist. When the defendant started providing "talk therapy," he assumed the duty of care applicable to mental health providers (*see McCracken v Walls-Kaufman*, 717 A2d 346, 352 [DC 1998]). For these reasons, we disagree with our dissenting colleague and conclude that the jury was entitled to find that the defendant committed medical malpractice by having a sexual relationship with the plaintiff, even where the plaintiff knew that the sexual relationship was not in furtherance or a part of the medical treatment.

The jury's determination to award punitive damages was justified. The evidence established that the defendant's departure from the standard of care predictably and inevitably damaged the plaintiff in those areas for which she sought treatment and was most vulnerable. Over the prolonged period during which the defendant departed from the applicable standard of care, the defendant's reprehensible conduct evinced a gross indifference to his patient's well-being (*see Randi A. J. v Long Is. Surgi-Ctr.*, 46 AD3d 74, 85 [2007]; *Brown v LaFontaine-Rish Med. Assoc.*, 33 AD3d 470, 471 [2006]).

Contrary to the defendant's contention, the Supreme Court properly denied his midtrial application to preclude evidence of certain special damages, inasmuch as, among other things, that application was untimely (*see Martin v We're Assoc.*, 127 AD2d 568, 569 [1987]; *cf. Bass v A & D Serv. Sta.*, 202 AD2d 464 [1994]).

The jury's award did not deviate materially from what would be reasonable compensation (*see* CPLR 5501 [c]).

The parties' remaining contentions are without merit. Covello, Balkin, and Austin, JJ., concur.

Skelos, J.P., dissents, and votes to reverse the judgment, grant those branches of the defendant's motion pursuant to CPLR 4404 (a) which were to set aside the jury verdict on the issue of liability and for judgment as a matter of law, and dismiss the cause of action alleging medical malpractice, with the following memorandum: In this action to recover damages for medical malpractice, a jury concluded that the defendant, a physician who was providing treatment to the plaintiff, committed malpractice by engaging in a consensual sexual relationship with the plaintiff, and that this malpractice proximately caused her emotional and economic damages. On appeal, the defendant argues, among other things, that he was entitled to judgment as

a matter of law because the plaintiff's evidence failed to demonstrate that he had committed acts of medical malpractice. I agree, and, therefore, respectfully dissent.

According to the plaintiff's trial testimony, in January 2000, she sought treatment from the defendant, a family practitioner, for symptoms that he diagnosed as depression and panic attacks. The defendant prescribed an antidepressant medication, and recommended that she seek counseling from a psychiatrist or psychologist, although the plaintiff did not initially do so. The plaintiff subsequently returned to the defendant's office approximately once or twice per month, at which times she discussed with the defendant her symptoms and the "stressors . . . in her life," and the defendant reassured her, giving her advice as to how to work through her panic attacks. According to the plaintiff, the defendant described this treatment as "talk therapy."

According to the plaintiff, in June 2001, while she was still the defendant's patient, the defendant initiated a sexual encounter, which the plaintiff reciprocated. The plaintiff testified that she was "infatuated" with the defendant because he was "meeting emotional needs" that her husband was not. In "the beginning of the summer that the affair started," the plaintiff also began meeting with a therapist whom the defendant had recommended. For the next nine months, according to the plaintiff, she and the defendant engaged in a consensual sexual relationship, while he continued to treat her. The plaintiff admitted at trial that she knew that the sexual relationship was not "part of the treatment." In March 2002 the plaintiff and the defendant mutually decided to end the relationship, and the plaintiff told her husband of the affair, which ultimately led to a divorce.

The plaintiff subsequently commenced this action, in which she asserted that the defendant committed medical malpractice by engaging in a sexual relationship with her while she was his patient. The jury agreed with the plaintiff, and awarded her damages for emotional injuries, as well as for loss of financial support from her husband arising from the divorce. The plaintiff's evidence, however, particularly in light of her own testimony that the consensual sexual relationship was unrelated to any medical treatment she received from the defendant, failed, as a matter of law, to demonstrate that the defendant committed any acts of medical malpractice.

Conduct by a physician constitutes malpractice "only when [it] constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment" (*Gross v Kurk*,

224 AD2d 582, 582 [1996]; *see Scott v Uljanov*, 74 NY2d 673 [1989]; *Bleiler v Bodnar*, 65 NY2d 65, 72 [1985]; *see also Bazakos v Lewis*, 12 NY3d 631, 634 [2009]). More specifically, conduct constitutes medical malpractice when "it can be characterized as a 'crucial element of diagnosis and treatment' and 'an integral part of the process of rendering medical treatment to [the plaintiff]' " (*Spiegel v Goldfarb*, 66 AD3d 873, 874 [2009], quoting *Bleiler v Bodnar*, 65 NY2d at 72; *see Weiner v Lenox Hill Hosp.*, 88 NY2d 784, 788 [1996] [the "inquiry" in a medical malpractice action involves "an analysis of the medical treatment furnished"]). In accordance with these principles, this Court, in *Gross*, affirmed the dismissal of the plaintiff's complaint alleging medical malpractice because she "made no allegation that her social and sexual relationship with the defendant constituted part of her treatment or was in any way related to her treatment" (*Gross v Kurk*, 224 AD2d at 582).

Even though the defendant in that case did not provide mental health services to the plaintiff, this Court's holding was the product of an application of the rule, stated in that case, that conduct constitutes malpractice "only when [it] constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment" (*id.*). The majority cites no authority for the proposition that conduct committed by physicians not providing mental health services constitutes malpractice only when it constitutes or is substantially related to treatment, whereas physicians providing mental health services can commit malpractice even when their conduct does not constitute treatment or bear a substantial relationship to treatment.

As in *Gross*, here, the plaintiff's evidence failed to prove that the defendant breached the duty he owed to her by virtue of their physician-patient relationship, notwithstanding the moral impropriety of his conduct. The plaintiff admitted at trial that she knew that the sexual relationship she had with the defendant was not part of her treatment (*cf. Roy v Hartogs*, 85 Misc 2d 891, 892 [1976] ["plaintiff was induced to have sexual intercourse with the defendant as part of her prescribed therapy"]). Indeed, the plaintiff acknowledges on appeal that the sexual relationship was "extraneous to treatment," but nonetheless contends that the sexual relationship need not be part of the treatment in order for her to prove that the defendant committed acts of medical malpractice. The case law she relies upon in connection with her contention that a sexual relationship "extraneous to treatment" may constitute medical malpractice, however, does not support her contention. In none of the cited cases is it clear that the courts were expressly presented with,

and decided, that issue (*see Marpe v Dolmetsch*, 246 AD2d 723 [1998] [granting the plaintiff's motion to amend the complaint to add a medical malpractice cause of action predicated upon sexual relations, without discussing whether the allegations would properly constitute medical malpractice]; *Coopersmith v Gold*, 172 AD2d 982 [1991] [concluding that the defendant was equitably estopped from asserting a statute of limitations defense to the plaintiff's malpractice claim predicated upon sexual relations with the defendant physician]; *Noto v St. Vincent's Hosp. & Med. Ctr. of N.Y.*, 160 AD2d 656, 656 [1990] [holding that "there (was) no cause of action for lack of informed consent, because the alleged sexual liaison was not a treatment or diagnosis"; no discussion of medical malpractice cause of action, which was left intact by Supreme Court]).

Instead of arguing that the sexual relationship constituted or bore a substantial relationship to medical treatment, the plaintiff here argues, and the majority agrees, that "where the sexual relationship actually interferes with the treatment and causes harm . . . then there is a civil remedy in the form of an action [to recover damages] for medical malpractice." It cannot reasonably be maintained, however, that any conduct committed by a doctor that interferes with a patient's treatment, no matter how unrelated to treatment or the practice of medicine, constitutes a departure from accepted medical practice (*see generally Gross v Kurk*, 224 AD2d 582 [1996]; *Scott v Uljanov*, 74 NY2d 673 [1989]; *Bleiler v Bodnar*, 65 NY2d at 72). For example, a physician's act of sexually assaulting a patient would undoubtedly harm the patient, including his or her mental health, and would likely interfere with any mental health treatment being provided. However, this Court has held that such conduct does not constitute medical malpractice because the injuries "stem[ ] from the alleged intentional assault by the defendant, not the medical services rendered" (*Fragosa v Haider*, 17 AD3d 526, 527 [2005]). Similarly, here, the plaintiff's alleged injuries stem from the defendant's intentional conduct of engaging in a consensual sexual relationship with her, extraneous to treatment.

Moreover, the mere fact that the plaintiff and the defendant had a physician-patient relationship does not render every act committed by the defendant toward the plaintiff one of medical malpractice (*cf. Weiner v Lenox Hill Hosp.*, 88 NY2d at 787-788 [although "a hospital in a general sense is always furnishing medical care to patients . . . not every act of negligence toward a patient would be medical malpractice" (internal quotation marks omitted)]; *Elashker v Medical Liab. Mut. Ins. Co.*, 46

AD3d 966, 967 [2007] [a thyroid examination performed on a nurse by a physician "merely provided the occasion for the alleged (sexual) assault and did not convert (physician's) acts into professional malpractice"]).

By engaging in sexual relations with the plaintiff, the defendant may have committed professional misconduct warranting disciplinary penalties, such as revocation of his license (*see* Education Law § 6530 [20]; *Matter of D'Angelo v State Bd. for Professional Med. Conduct*, 66 AD3d 1154 [2009]; *Matter of Barad v State Bd. for Professional Med. Conduct*, 282 AD2d 893 [2001]). Further, the defendant undoubtedly acted unethically from a moral perspective, particularly due to the plaintiff's vulnerable emotional state. However, not all immoral conduct is actionable in tort. Nor does a violation of professional ethical guidelines, if such were the case here, by itself necessarily support a civil cause of action to recover damages for malpractice (*cf. Nesenoff v Dinerstein & Lesser*, 5 AD3d 746, 748 [2004]; *Schwartz v Olshan Grundman Frome & Rosenzweig*, 302 AD2d 193 [2003]; *Mills v Pappas*, 174 AD2d 780, 782 [1991]; *Brown v Samalin & Bock*, 155 AD2d 407 [1989]). The evidence here demonstrated that the sexual relations between the defendant and the plaintiff were not an " 'element of diagnosis and treatment' " or " 'an integral part of the process of rendering medical treatment to [the plaintiff]' " (*Spiegel v Goldfarb*, 66 AD3d at 874, quoting *Bleiler v Bodnar*, 65 NY2d at 72) but, rather, were, as the plaintiff concedes, "extraneous to treatment." Accordingly, the plaintiff's cause of action to recover damages for medical malpractice fails as a matter of law.

While the majority relies, in part, upon its conclusion that the sexual relationship "clearly had an impact upon the plaintiff's level of trust and openness with her other therapist," the majority's judgment about the plaintiff's "level of trust and openness with her other therapist" is not supported by expert testimony or other evidence in the record. In any event, even if the sexual relationship had such an effect, that does not create a substantial nexus between the sexual relationship and the treatment rendered by the defendant.

The majority also relies, in part, upon the testimony of the plaintiff's expert regarding the "transference phenomenon." The plaintiff's expert testified that the plaintiff experienced a "ubiquitous phenomenon" known as "eroticized transference," whereby the patient "re-experiences" feelings he or she had for a parent during "early life" and "puts them on the psychiatrist." The expert opined that the plaintiff's sexual feelings toward the defendant, and her failure to control these impulses,

were related to this "phenomenon." The plaintiff, however, invokes this testimony only in arguing that the jury erred in apportioning any fault to her for the damages she sustained as a result of her sexual relationship with the defendant, and not to support her theory of how the defendant committed malpractice. Despite the expert's testimony regarding the "transference phenomenon," he made clear, as does the plaintiff on appeal, that the alleged "departure" from good and accepted medical practice was "sex between [the defendant] and [the plaintiff]" (*see Physicians' Reciprocal Insurers v Giugliano*, 37 AD3d 442, 444 [2007] ["Dupree's amended complaint alleged solely that Dr. Giugliano acted negligently by engaging in sexual contact with her, and did not indicate any misconduct by Dr. Giugliano beyond this alleged sexual contact"]). As previously discussed, the defendant's act of engaging in sexual relations with the plaintiff, even if her desires were the product of the "transference phenomenon," did not contribute to the provision of, or the failure to provide, medical treatment and, thus, while unethical, was not an act of medical malpractice (*see Gross v Kurk*, 224 AD2d at 582; *cf. Fragosa v Haider*, 17 AD3d 526 [2005]; *Karczewski v Sharpe*, 248 AD2d 679, 680 [1998]).

Accordingly, I would reverse the judgment, grant those branches of the defendant's motion pursuant to CPLR 4404 (a) which were to set aside the jury's verdict in the plaintiff's favor on the issue of liability and for judgment as a matter of law, and dismiss the cause of action to recover damages for medical malpractice.